# THE UNITED RAILWAYS AND ELECTRIC CO. OF BALTIMORE.

## vs.

## LAURA B. CRAIN AND FRANK E. CRAIN, HER HUSBAND.

*Railroads: trolley cars; railroad crossings; rights and duties; giving signals.  Evidence: negative evidence; credibility and effect.  Automobiles: railroad crossings; guests of owner or driver; duty; negligence.*

Railroad trains have precedence in passing the crossing at public ways; but it is the duty of those directing them to be careful to give all proper and sufficient signals of their approach, and to take all precautions reasonable in view of the` nature of the crossing, to avoid collision.                                        p. 342

Failure in the strict performance of this duty to the public, whereby injury is inflicted upon individuals, subjects the company to liability to respond in damages to the party injured.
                                        p. 342

Where the attention of those testifying to a negative (as the fact that no whistle or bell was sounded at a railroad crossing) was not attracted to the occurrence which they say they did not see or hear, and where their situation was not such that they probably would have observed it, their testimony is not inconsistent with that of credible witnesses who were in a situation favorable for such ·observation and who testified affirmatively and positively to the occurrence.                                        p. 347

But if it be shown that such witnesses could have observed the signal if it had been given, and that their attention was attracted to it because of a duty imposed upon them in that connection, or because of the known position of danger in which they were at the time placed, naturally suggesting that they, for their own safety and protection, should look and listen for the warning or signals of danger; or if it be shown from the facts and circumstances of the case that for any cause or reason their attention was attracted thereto, and that they at such time were listening for the ringing of bells or the sounding of the whistle, the fact that they did not hear the signal is evidence sufficient

to go to the jury, as tending to show that such warning or signal was not given.                                    p. 347

Opportunity of the witness of hearing the signals, the place where he was located at the time, whether he was on the lookout for the train and listening for the signals are all important matters to be taken in consideration by the trial judge when he is called on to pass upon the question whether such negative testimony is of sufficient probative force to warrant its submission to the jury.                                    p. 347

Where the party operating an automobile in the open country knew that they were approaching the crossing of an electric railroad that was somewhere in the neighborhood, and was on the lookout for the same, his testimony that there was no signal blown is some evidence to go to the jury to show that a trolley car with which the automobile had come into collision had approached the crossing without giving any signals.    p. 349

When a Court is determining the question of whether or not there is any evidence of a question to be submitted to the jury, it is not for the Court to determine the weight of the evidence, but simply whether or not there was any evidence in the case legally sufficient to entitle to have the case considered by the jury.
                                          p. 349

In a case for damages against a railway company for injury caused by collision with a vehicle at a public crossing, if the only ground for complaint against the railway company because of its negligence is the fact that its agents failed to sound the signal as the train approached the crossing, the attention of the jury should be specifically directed in its finding to the alleged failure of the defendant to sound such whistle.      pp. 349-350

Where one is riding in a vehicle as the guest of the owner or driver, it is as much his duty as that of the owner or driver to take observation of dangers and to avoid them if practicable by suggesting and protesting, and he is required to exercise ordinary care to avoid injury.                    pp. 350-351

Whether, under all the circumstances of the case, such passenger exercised due care, is generally a question for the jury.
                                          p. 351

*Decided April 24th, 1914.*

Appeal from the Superior Court of Baltimore City. (Daw-kins, J.)

Laura B. Crain having been injured by the collision of an automobile with one of the cars of the defendant, brought suit therefor, with her husband, and recovered a judgment on a verdict in her favor for $3,000. This appeal was taken by the Railway Company.

The following are the prayers of the plaintiff and defendant, with the action of the Court upon each:

*Plaintiffs' First Prayer*—If the jury find that on or about the 18th day of August, 1912, the female plaintiff was injured by a car of the defendant, while operated by its agents on its road and that said injury resulted directly from the want of ordinary care and prudence of the agents of the defendant, and not from the want of ordinary care and prudence on the part of the female plaintiff, directly contributing to the injury, then the plaintiffs are entitled to recover, provided the jury shall find further that the road at the point where the accident occurred was at the time of said accident used by the public as a thoroughfare. (*Granted.*)

*Plaintiffs' Second Prayer*—That if they find the facts set forth in the plaintiffs' first prayer, and further find that at the time of the accident therein referred to the female plaintiff was an invited guest in said automobile and that she exercised no control over the driving and management of same, but that the said automobile was owned by the witness, Harvey L. Goodman, and that the said Harvey L. Goodman was driving and controlling the said automobile, that even if they find that the said Harvey L. Goodman was guilty of negligence in the manner in which he managed and drove said automobile which contributed to the happening of the accident, that as a matter of law, the negligence of Harvey L. Goodman cannot be imputed to the female plaintiff, and forms no bar to the right of recovery of the plaintiffs in this

case against the defendant; and further that there is no evidence in this case legally sufficient to show any negligence on the part of the plaintiffs directly contributing to the happening of the injury complained of.   (*Granted.*)

*Plaintiffs' Third Prayer*—If the jury shall find a verdict for the plaintiffs then in estimating the damages they are to consider the health and condition of the female plaintiff before the injury complained of, as compared with her present condition in consequence of said injury and whether the same is in its nature permanent and how far, if at all, it is calculated to disable her from engaging in those employments for which, in the absence of such injury, she would have been qualified; and also the physical and mental suffering, if any, to which she was subjected by reason of said injury, and to allow the plaintiffs such damages as in the opinion of the jury will be a fair and just compensation for the injury which the female plaintiff has sustained. (*Granted.*)

---

*Defendant's First Prayer*—The Court instructs the jury that under the pleadings there is no legally sufficient evidence of negligence on the part of the defendant, its agents or employees, as a direct and proximate cause of the injuries complained of and the verdict must be for the defendant.   (*Refused.*)

*Defendant's Second Prayer*—The Court instructs the jury that the uncontradicted evidence shows that the driver of the automobile was guilty of negligence in attempting to cross the tracks of an electric railway in the country without first ascertaining whether or not a car was approaching and that if the driver had not been negligent in this respect, the accident would not have occurred and there is no legally sufficient evidence to show that after the motorman saw, or could have seen, that the automobile was in a position of danger upon the track or that it was in close proximity to the track, and that the driver of the same was unable to stop the same before

it would get upon the track, that the motorman could have by the use of ordinary care avoided the consequences of the negligence of the driver of the automobile and the verdict of the jury must be for the defendant.   (*Refused.*)

*Defendant's Third Prayer*—The Court instructs the jury that the motorman of the electric car if he saw the automobile approaching the car tracks, had the right to assume that the chauffeur had his machine under complete control and that he would stop the automobile before attempting to cross the track in close proximity to the on-coming car or to run into the side thereof, and there is no legally sufficient evidence to show that after it should have become apparent to the motorman of the car that the driver of the automobile did not have his automobile under complete control and that he would be unable to stop the same before running into the side of the car the motorman could not have by the use of ordinary care avoided the consequences of the negligence of the chauffeur to have his automobile under proper control or to ascertain that there was a car approaching, then the verdict of the jury must be for the defendant.   (*Refused.*)

*Defendant's Fourth Prayer*—The Court instructs the jury that it is the duty of the driver of an automobile when approaching the tracks of an electric railway in the country to have his automobile under control and to look and listen for a car which may be approaching, and if the view is obstructed, to stop, look and listen to ascertain whether a car is approaching and the uncontradicted evidence shows that the driver of the automobile was negligent and did not exercise the care required of him by law and that his negligence was the last and final negligent act and whatever the right of recovery may be against the driver of the automobile, the verdict of the jury must be for the defendant, the railways company.   (*Refused.*)

*Defendant's Fifth Prayer*—The Court instructs the jury that it is the duty of an automobile driver when approaching the tracks of an electric railway in the country to have his machine under complete control and to look and listen for a

car which may be approaching and if the view is obstructed in approaching the track, to stop, look and listen to ascertain whether a car is approaching, the track and overhead trolley wires and poles being notice or warning of danger, and the uncontradicted evidence shows that the driver of the automobile was negligent and did not exercise the care required of him by law, and that his negligence was the direct and proximate cause of the accident, without which the accident would not have occurred and the verdict of the jury should be for the defendant.    (*Refused.*)

*Defendant's Sixth Prayer*—The Court instructs the jury that there is no legally sufficient evidence that the accident complained of was the direct consequence of any negligence on the part of the defendant or its employees and the verdict of the jury should be for the defendant.    (*Refused.*)

*Defendant's "A" Prayer*—The Court instructs the jury that it is the duty of an automobile driver when approaching the tracks of an electric railway in the country to have his machine under control and to look and listen for a car which may be approaching and if the view is obstructed in approaching the track to stop, look and listen to ascertain whether a car is approaching; and if the jury shall find that the driver of the automobile failed to observe these precautions and that such failure on his part was the direct and proximate cause of the accident, without which the accident would not have occurred, the verdict of the jury should be for the defendant.    (*As submitted; refused.*)

*Defendant's "A" Prayer*—The Court instructs the jury that it is the duty of an automobile driver when approaching the tracks of an electric railway in the country to have his machine under control and to look and listen for a car which may be approaching and if the view is obtsructed in approaching the track to stop, look and listen to ascertain whether a car is approaching; and if the jury shall find that the driver of the automobile failed to observe these precautions and that the accident could not have been avoided by the exercise of an ordinary degree of care on the part of the

defendant, then the verdict must be for the defendant.  (*As modified by the Court and granted.*)

*Defendant's "B" Prayer*—The Court instructs the jury that in the open country as is well known cars are permitted to run at much greater speed than is permissible on the crowded thoroughfares of the city, and those in charge of the car are not required to reduce the speed of the car as they approach a road crossing, therefore, in the country more caution is required of persons attempting to cross the tracks of an electric railway, and the Court instructs the jury that if they shall find that the driver of the automobile did not use due care and that he was negligent and shall further find that his negligence was the last and final negligent act and the proximate cause of the accident then the verdict of the jury should be for the defendant in this case.  (*Refused.*)

*Defendant's "C" Prayer*—The Court instructs the jury that the burden of proof is upon the plaintiff to establish by the weight of the evidence, that the defendant or its employees were negligent; and further that the accident complained of was directly due thereto; and unless it has been shown by the weight of evidence to the satisfaction of the jury that the defendant or its employees were negligent and that the accident was diretly due to their negligence, the verdict of the jury should be for the defendant in this case. (*Granted.*)

*Defendant's "D" Prayer*—The Court instructs the jury that if they shall find from the evidence that at the time of the accident mentioned in the testimony the female plaintiff was a passenger in the automobile mentioned in the evidence, then it was the duty of the driver of the automobile to exercise the highest degree of care and skill practicable under all the circumstances for her care and safety, and if the jury shall further find that the driver of the automobile failed to use such care and that his failure to do so was the direct and proximate cause of the accident without which the accident would not have occurred, if the jury so find, then the verdict

of the jury should be for the defendant in this case.    (*As submitted; refused.*)

*Defendant's "D" Prayer*—The Court instructs the jury that if they shall find from the evidence that at the time of the accident mentioned in the testimony the female plaintiff was a passenger in the automobile mentioned in the evidence, then it was the duty of the driver of the automobile to exercise the highest degree of skill practicable under all circumstances for her care and safety, and if the jury shall further find that the driver of the automobile failed to use such care and that the defendant could not by the use of ordinary care have avoided the accident if the jury so find, then the verdict of the jury should be for the defendant in this case.    (*As modified by the Court and Granted.*)

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Joseph C. France* (with whom were *J. Pembroke Thom* and *Lee S. Meyer* on the brief), for the appellant.

*William Colton,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

This is an action brought by the appellee, plaintiff below, against the appellant company to recover for personal injuries received by the plaintiff in consequence of a collision between the car of the defendant and the automobile in which the plaintiff was riding as a passenger, resulting, as it is alleged, from the negligence of the defendant in the operation and management of its car.    The injury was received at a crossing of a public highway in Baltimore county known as the North Point Road.

The record discloses that Harvey L. Goodman, a resident of Baltimore City, invited the plaintiff and others to ride with him in his automobile.    The party consisted of Goodman, his wife, Miss Akehurst, Adolph Prutz and the plain-

tiff. The three women sat upon the back seat and the two men upon the front seat of the automobile. Goodman, the owner of the automobile, and who was also a competent chauffeur, had the control and management of it on the occasion of the accident.

Neither Goodman nor the plaintiff was familiar with the road. Goodman had been upon it once before about a year prior to the accident and recalled that the defendant's road crossed it, but did not know the exact point. A short while before reaching the crossing, when about three-fourths of a mile from it, Goodman testified, "I made mention to Mr. Prutz about this crossing being in the vicinity somewhere, I didn't know just where, but we should look out, keep looking out, that we did not get into any danger of an approaching car; so we both were on the lookout, I will say possibly three-fourths of a mile, may be more than that, before we got to it, and we watched as close as we could watch for the railroad," but they did not see the track until they were practically upon it. As Goodman expresses it, "At such time I heard the rumbling of a car coming at a high rate of speed, * * * and I looked and saw the car practically within a few feet of me, and the only thing I could do, there was nothing more, the thought came to my mind to turn the wheel as short as possible and run with the car." This he attempted to do, hoping, as he said, to avoid a collision, or failing in this, that the car would so strike the automobile as to give it what he termed a "side swipe," and thereby avoid the danger of those in the automobile getting under the wheels of the car. He partially made the turn, but did not avoid the collision. The left wheel of the automobile came in contact with the front car at or near its front truck, as stated by plaintiff's witnesses, or at the middle of the car, as stated by the defendant's witnesses, which resulted in turning over the automobile and catching the plaintiff under it, inflicting upon her the injuries complained of.

At the time of the accident the automobile was moving southward on said public road, and the defendant's train, consisting of two cars, was moving westward towards the city. The road of the defendant company crosses the highway at nearly right angles. Its tracks are laid with "T" rails spiked to crossties, with gravel and crushed stone ballast, which at the crossing was covered with dirt, bringing the surface between the rails to a level with the road. The plaintiff's witnesses testified, and they were not contradicted, that the white sand of the road and the shell dust covering the space between the rails made it difficult to observe the crossing, and for this reason could not see it until they got practically upon it.

There is on the east side of the highway, both on the north and south sides of the railroad, at the crossing, a woods which extends within a few feet of the said public highway and also extends to the right of way of defendant's road, and on the north side of the crossing the land has an elevation of three or four feet above the bed of both the highway and the railroad, and a car approaching the said public road from the east cannot be seen from said highway until a point is reached thereon within a few feet of the crossing. This fact is shown by the testimony of the motorman of the car, who testified, "When I got about twelve feet from the North Point Road, I could see about twelve or fifteen feet upon the North Point Road, and I *seen* the automobile coming at a high rate of speed. I saw he would hit me and I tried to stop as soon as I could," and with the use of air brakes and the sand lever he stopped the car at a distance of one hundred and twenty to one hundred and twenty-five feet from the west side of the public road. It would, therefore, follow that Goodman, in the automobile, at a point twelve or fifteen feet from the track could have seen only twelve or fifteen feet eastward up the railroad. But upon the westward side of the highway the country is open, sloping towards the west, and the poles fifteen to eighteen inches in *diameter* bearing the feed, trol-

ley and span wires, located on each side of the track at a distance of one hundred to one hundred and ten feet apart, may be readily seen from the highway, extending for a distance of about a half mile to the westward.

As stated by the defendant in his brief, the "special exceptions to the plaintiff's first and second prayers and the defendant's first, second, third, fourth, fifth and sixth prayers, present the question of whether there was any legally sufficient evidence of causal negligence on the part of the defendant which resulted in the accident of which the plaintiffs complain."

The defendant contends "that the evidence shows that the recklessness of the driver was the only negligent act having any causal connection with the accident, and that there is no evidence that the accident was caused by any negligence on the part of the defendant or its employees."

The evidence shows that the crossing was one of more than ordinary danger, and therefore required the exercise of more than ordinary care, both on the part of parties attempting to cross the tracks of the railroad, and of the managers of passing trains. This duty is mutual and reciprocal, and not confined to one party only. The railroad trains, from the nature of things, have the precedence of passing the crossings of public ways unobstructed; but it is the duty of those directing the trains to be careful to *give all proper and sufficient signals of their approach,* and to take all reasonable precaution, in view of the nature of the crossings, to avoid collision. Failure in the strict performance of this duty to the public whereby injury is inflicted upon individuals, will subject the company to liability to respond in damages to the injured party. *Philadelphia, Baltimore & Washington R. R. Co.* v. *Hogeland,* 66 Md. 160.

The record in this case discloses no legally sufficient evidence of any negligent act of the defendant having any causal connection with the accident complained of unless it be that it

failed to give the required signal of its approach to the crossing.

The testimony of Anderson, the motorman, was that he first blew the whistle at a point seventy-five feet east of a private road that crosses the railroad three hundred and fifty feet east of said public road; that he again blew the whistle at the green signal seventy-five feet at each of the crossing upon said public road, and that at each of such times he gave two short blasts. In speaking of the whistle he described it as a "screechy whistle" and made a loud noise.

William Webb, a passenger on defendant's car, stated that he was seated in the front car and heard "two small, short toots, a sort of toot, toot, as we were starting in through the woods; there is a little woods on both sides of the track just east of North Point Road."

Wilbert F. Parrill, another passenger in the rear car of the defendant, testified that he heard the whistle of the car just before reaching North Point Road, and upon looking out saw a green signal. He also heard the whistle blow several times before that, but did not exactly locate the places.

Elizabeth Krupp, a little girl, and her companion, Elizabeth Frede Meyer, on the occasion of the accident were upon the track of the defendant company at a point westward of the North Point Road; they were walking eastwardly upon the track, meeting the defendant's car, counting the ties on the road, as they said, when they heard the whistle of the car some distance ahead of them, and before the car had reached North Point Road. It resulted in their getting off the track, but they still continued to walk beside it in the direction of the accident and saw it when it occurred.

William Hook, another passenger in the front car of the defendant, also testified that "before they came to the crossing, the motorman blew his whistle, I took very particular notice to it, too."

Goodman, the owner and chauffeur in charge of the automobile, when asked "Was there any whistle that was

sounded?" answered, "No whistles." Ques.: "Is your hearing good or bad?" Ans.: "It is good."

Adoplh Prutz, who was seated beside Goodman in the automobile, when asked: "Did you, or not, hear any sound or whistle?" replied, "No, sir, not until it got right on us and didn't have much time to think."

Miss Akehurst, who was upon the back seat of the automobile, testified: "We never heard the car whistle and we never heard nothing until we saw one end of the car come from behind the trees."

Mrs. Goodman, who was also upon the back seat of the automobile, when asked: "Did you, or not, hear any whistle?" replied, "I heard nothing at all."

The plaintiff, Mrs. Crane, did not say whether she heard or did not hear the whistle.

In the case of *Foley* v. *N. Y. Cent. & Hudson River R. R. Co.,* 197 N. Y. 430, vol. 18 *A. & E. Annotated Cases,* 631, "various employees of the defendant, some of whom were charged with a duty in respect thereto, testified positively that the bell operated automatically and that it rang constantly as the engine approached the crossing. Several witnesses sworn in behalf of the plaintiff for the purpose of establishing that it did not ring until after the accident and the witness in each case did testify that he did not hear the bell ring before the accident. Upon further examination, however, such witness invariably testified, in substance, that he did not listen for the bell and that his attention was not in any way directed at the time to the question whether it was or was not ringing, and also made it clear that he was in such a position that he probably must have heard the bell if it did ring. Thus each witness at the close of his examination made it appear that his failure to hear the bell ring did not occur under such circumstances as to fairly indicate that it did not in fact ring." Under these circumstances the evidence was regarded as insufficient.

In the case of *Culhane* v. *N. Y. Cent. & Hudson R. R. Co.,* 60 N. Y. 133, the Court there said: "The two witnesses for

the plaintiff merely say they did not hear the bell, but they do not say that they listened or gave heed to the presence or absence of that signal. * * * As against positive, affirmative evidence by credible witnesses to the ringing of a bell or the sounding of a whistle, there must be something more than the testimony of one or more that they did not hear it, to authorize the submission of the question to the jury. It must appear that they were *looking, watching and listening* for it, that their attention was directed to the fact, so that the evidence will tend to some extent to prove the negative. A mere "I did not hear" is entitled to no weight in the presence of affirmative evidence that the signal was given, and does not create a conflict of evidence justifying a submission of the question to the jury as one of fact."

In the case of *Menard et al.* v. *Boston & Maine R. R. Co.*, 23 N. E. 214, it is said, "A witness may be in any conceivable attitude of attention or inattention which will give his evidence value or leave it with little or no weight. But where his position is such that the sound would have been likely to have attracted his attention if the bell had been rung, his failure to hear it, is some evidence that there was no ringing. In the case at bar there were six witnesses who testified that they heard no bell or whistle. All of these were in such positions that they easily might have heard if the signals had been given; and three of them were riding at great risk to their lives if they failed to notice such signals as they heard. These three would certainly be expected to attend carefully and to know whether there was any warning to apprise them of danger. We are of opinion that the jury should have been permitted to consider all the evidence in the case upon the question whether the defendant failed to ring the bell or sound the whistle as required by law."

In the case of *Balto. & Ohio R. R. Co.* v. *Roming*, 96 Md. 67, *the only evidence of any negligence* on the part of the defendant was the testimony of two persons, Sykes and Phillips, who resided a short distance away from the station, that they heard at their residence "no whistle or bell from the

engine prior to the danger signal which came simultaneously
with the crash of the collision," as over against the distinct
and circumstantial evidence of the engineer and the fireman.
and the operator in the block signal tower at the station that
the customary signals of the approach of the train were
exchanged between the engine, by whistling, and the tower,
by moving the block signal, and that the bell was rung from
the engine as usual. The Court there held that such testi-
mony of the defendant's alleged negligence was not sufficient
to go to the jury. But it was not shown in that case that the
attention of the witnesses Sykes and Phillips was in any way
attracted to the whistle or bell of the engine. They were not
charged with any duties in respect thereto and were not at
the time in any situation of danger in connection therewith,
nor did the record disclose any reason they might have had
for giving heed to signals of danger from the engine as it
approached the crossing.

In the case of the *Northern Central Ry. Co.* v. *Gilmore,*
100 Md. 404, the witness Kenny, who was standing in the
door of a saloon nearby, and Dean, a cart-driver, who was
also nearby at the time of the accident, testified they heard
no bell rung or signal given from the engine as it approached
the crossing, and Henry Ruth, another cart-driver, testified
that "the engine didn't rink any bell or blow any whistle
there; there was nothing at all done, only after the boy was
in danger and could not get out of it, the gatekeeper tried
to make him come back." Against this was the evidence
of the engineer, fireman, conductor, gatekeeper and two
brakemen who testified that the bell was ringing at such
time.

In that case the defendant asked the Court to instruct the
jury that "the testimony of witnesses that they did not hear
the bell was not evidence that it was not rung and must be
entirely disregarded by them," and in their brief and argu-
ment the defendant's counsel relied upon the case of *Balto.
& Ohio R. R. Co.* v. *Roming, supra,* as an authority for
the granting of such instruction, but the Court in refusing

the instruction asked for, said: "That is pushing the doctrine of *Roming's Case* further than it was intended by us to go."

It may be safely stated, from the above cited authorities and others, that where the attention of those testifying to a negative was not attracted to the occurrence which they say they did not see or hear, and where their situation was not such that they probably would have observed it, their testimony is not inconsistent with that of credible witnesses who were in a situation favorable for observation and who testified affirmatively and positively to the occurrence. *Chicago, etc.. R. R. Co. v. Andrews* (C. C. A.), 130 Fed. Rep. 65. But if it be shown that the witness could have observed the signal, had it been given, and that his attention was attracted thereto because of a duty imposed upon him in connection therewith, or because of the known position of danger in which he was at the time placed, naturally suggesting that he, for his own safety and protection, should look and listen for the warning or signal of danger; or if it be shown from the facts and circumstances of the case that for any cause or reason his attention was attracted thereto and that he at such time was listening for the ringing of the bell or the sounding of the whistle the fact that he did not hear the signal is evidence sufficient to go to the jury tending to show that such warning or signal was not given.

It must be conceded that it is difficult at times to determine whether that which is termed negative testimony has sufficient probative value to warrant its submission to the jury. "The opportunity of the witness of hearing the signals, the place where he was located at the time, whether he was on the lookout for the train and listening for the signals, are all important matters to be taken into consideration by the trial judge when he is called on to pass upon this question." *Winterbottom* v. *P. B. & W. R. Co.,* 217 Pa. St. 574, 66 Atl. Rep. 864.

In the case before us Goodman, the owner, who as chauffeur, was in charge of the automobile at the time

of the accident, testified he knew there was a crossing somewhere in the vicinity, but just where he did not know, and suggested to Prutz, who was sitting beside him, that they should look out, keep looking out, that they did not *get in any danger from an approaching car;* that they both looked out for about three-fourths of a mile before reaching the crossing. And Prutz testified "We had been looking for for the crossing, we were looking out for it, and by the time we got there the car shot by." What was said by Goodman concerning the crossing in that vicinity and the necessity for watchfulness to avoid danger from an approaching car, was heard by those with him in the automobile and all were fully aware of the dangerous position in which they were placed in respect to an approaching car, and such position would naturally suggest to them, looking to their own safety and protection, that they should look and listen for signals of warning from an approaching car, and they all, except the plaintiff, including both Goodman and Prutz, testified that they heard no whistle or signal of warning as it approached the crossing, and Goodman tetsified there was "no signal" blown, not simply that he did not hear it, but as a matter of fact it was not blown. In this particular this case is unlike the *Roming Case,* but similar to the *Gilmore Case.* In the former case the witnesses testified they did not hear the signals, while in the latter case one of the witnesses for the plaintiff testified that "the engine did not ring any bell or blow any whistle."

The evidence of the motorman and others in the car was that he, the motorman, blew the whistle when at the "green signal," seventy-five feet east of the crossing, at which time he was going twelve or fifteen miles an hour. It is not shown exactly where upon the public road the automobile was at this time, nor does the evidence disclose how fast it was going. The only evidence in respect thereto is that of the motorman and Miss Akehurst; the former said it was going at a high rate of speed, while the latter said it was going "very slowly." Goodman, who could have spoken with more

accurateness as to the speed of his automobile than the
others, is silent in respect thereto, although his attention was
called to it when asked if he had not stated to someone that
he was running along the road at about fifteen miles an
hour. But, in any event, the automobile could not have been
very far from the crossing at the time the whistle was said
to have been blown seventy-five feet therefrom. The whistle
was a loud, screechy whistle, as testified to by the motorman,
and the question whether it could have been heard by Good-
man and those in the machine with him, who testified that it
did not blow, or that they did not hear it, although listen-
ing, should have been submitted to the jury upon the evi-
dence of said witnesses. Had the whistle been heard by
Goodman or by any of those with him in the automobile and
the fact communicated to him, he could have avoided the
accident, and thus the failure of the defendant to give such
signal, if that fact be shown, would, we think, have a close
causal connection with the accident.

The evidence of Goodman, who testified that there was no
whistle, and the evidence of Prutz, Mrs. Goodman and Miss
Akehurst, all of whom testified that they did not hear the
whistle, we think under the circumstances and facts of this
case, should have gone to the jury. We are not called upon
to determine the weight of the evidence that the whistle was
not heard, as against the positive evidence of the defendant
that the whistle was blown; that was for the jury, but we
simply pass upon the question whether there was evidence
legally sufficient to entitle the plaintiff to have her case con-
sidered by the jury, and as we have just said, in our opin-
ion the evidence referred to should have been submitted to
the jury. *P. B. & W. R. R. Co.* v. *Hogeland,* 66 Md. 160.

But in submitting this case to the jury, we think the refer-
ence in the first prayer of the plaintiff to the want of ordi-
nary care and prudence on the part of the defendant was,
under the facts and circumstances of the case, too generally
stated. The attention of the jury should have been specific-
ally directed in its findings to the alleged failure of the

defendant to blow its whistle, inasmuch as that is the only negligence of the defendant, if it be shown to exist, that is found in this case. We do not mean to say that this is not ordinarily a good prayer in cases of this character, for it has been repeatedly held to be good in other cases, but in this case, where the alleged negligence of the defendant is confined solely to its alleged failure to blow the whistle as the train approached the crossing, we think, by the prayer, the mind of the jury should have been specifically directed to that question, but inasmuch as the lower Court was not requested to be more specific and as the prayer follows others which have been approved, we would not reverse the case on this ground.

By the second prayer of the plaintiff the Court was asked to instruct the jury that should they find the facts contained in the first prayer, and should further find that, at the time of the accident, the female plaintiff was an invited guest in the automobile, and that she exercised no control over the driving and management of the same, but that the same was owned by the witness Harvey L. Goodman, and that the said Harvey L. Goodman was driving and controlling the said automobile, that even if they find that the said Harvey L. Goodman was guilty of negligence in the manner in which he managed and drove the automobile, which contributed to the happening of the accident, that as a matter of law the negligence of Harvey L. Goodman cannot be imputed to the plaintiff and forms no bar to the right of recovery of the plaintiff in this case against the defendant; *and further, that there is no evidence in this case legally sufficient to show any negligence on the part of the plaintiff directly contributing to the happening of the injury complained of.*"

In the case of *P., B. & W. R. R. Co.* v. *Hogeland,* 66 Md. 160; *B. & O. R. R. Co.* v. *State, use of Strunz,,* 79 Md. 335, and *United R. R. Co.* v. *Beidler,* 98 Md. 564, this Court has held, That "it may be stated as the general rule of the courts of this country, with but few exceptions, that the contributory negligence of a carrier, or of the driver of a public or

private vehicle, not owned or controlled by the passenger, and who is himself without fault, will not constitute a bar to the right of the passenger to recover for injuries received. The only principle upon which such contributory negligence could bar the right of recovery is, that the driver should be regarded as the agent or servant of the passenger." This is undoubtedly the established law of this state and we have no inclination to depart from it.

In this case the question before us, as we view it, is not whether Goodman's negligence is to be imputed to the plaintiff, but whether she omitted that due care which under the circumstances she was bound to take, and whether there is evidence to be found in the record sufficient to go to the jury tending to show a want of such care on her part.

The case of *Brommer* v. *Penn. R. R. Co.* 179 Fed. 577, 29 L. R. A. (N. S.), 924, is very much like the case at bar. In that case Brommer was driving his automobile which collided with a train. With him were Mr. and Mrs. Henderson and Miss Blockson, all of whom Brommer had invited to ride with him. Mrs. Henderson was killed and the other three occupants injured. These three brought suit. The three cases were tried together and were so argued in the Court above. In the trial Court Brommer was held guilty of contributory negligence and it directed a verdict against him, but verdicts and judgments were recovered by Henderson and Miss Blockson. Appeals were taken from each of these judgments. The judgment against Brommer was affirmed; the one in favor of Henderson was reversed, and the judgment received by Miss Blockson affirmed.

In discussing the *Henderson Case* the Court said: "Brommer then being culpably negligent, was Henderson, who sat on the seat beside him, any less so? * * * In our view the question before us is not whether Brommer's negligence is to be imputed to other occupants of the car, but whether they, or any of them, omitted that due care—and negligence is lack of due care—which under the circumstances they

were bound to take. * * * Henderson was under obligation to take due care of his own safety. He was not a passenger for hire. He was engaged in a common purpose of a pleasure ride with the driver of the machine. He knew they were approaching a railroad crossing. Being free from the engrossing work of operating the machine, and occupying a seat beside the driver, he was in an even better situation than Brommer to look out for the safety of the machine. His own safety and the instinct of self-preservation should have led him to do so. Under the circumstances his duty was well stated in *Davis* v. *Chicago & R. I. & P. R. Co.,* 16 L. R. A. (N. S.), 424, 88 C. C. A. 496, 159 Fed. 18, where it was said: 'Under the facts of this case the relation that the plaintiff sustained to his companion Pfeutze did not permit him to sit dumb and inert in the vehicle, taking no heed of a known danger, permitting Pfeutze to drive into a pitfall or on a deadly railroad track, implicitly trusting his life and limbs to the discretion of his companion without a word of warning or protest.' It is now the better recognized rule of law that as to such a person situated as was the plaintiff, riding in a vehicle in mere companionship with his friend, engaged upon mutual adventure, it is as much his duty as that of the driver to take observation of dangers and to avoid them if practicable, by suggestion and protest. In other words, he is required to exercise ordinary care to avoid injury. *Mittelsdorfer* v. *West Jersey & S. R. Co.,* 77 N. J. L. 702, 73 Atl. 540; *Wachsmith* v. *B. & O. R. Co.,* 233 Pa. 465, S. C. 82 Atl. 755 and 27 *Am. & Eng. An. Cases* (1913 B), 679; *Clarke* v. *Connecticut Co.,* 76 Atl. 523.

The Court held in the *Brommer Case* that there was no escape from the conclusion that Henderson was equally culpable with Brommer. But in the case of Miss Blockson the judgment of the Court below was affirmed, and the Court in its opinion said: "While holding her to a due measure of care in so far as her situation and surroundings enabled her to exercise it, we have no proof she did not exercise it, or

that anything she saw or failed to see contributed in any way to the accident. * * * She frankly admits that she did not look, for the reason that she was sitting in the back seat of the automobile, and, as it appears, on the opposite from that from which the train approached. * * * There is no evidence to show she knew that they were approaching a railroad crossing, or from the position she occupied, sitting behind the men on the front seat, she could have known it by the exercise of ordinary care." The Court held in her case that they could not say, as a matter of law, that she was guilty of contributory negligence.

Nor can we say in this case, upon the evidence produced, that the plaintiff, as a matter of law, was guilty of contributory negligence, but, nevertheless, we think the evidence tending to show a want of due care on her part—which under the circumstances she was bound to take—should have been submitted to the jury. The plaintiff testified that "just before, hardly two minutes before the accident, I heard Mr. Goodman make a remark to Mr. Prutz, "now there is a crossing along here somewhere, just where it is located I do not know. He said that, I heard it plain, and it didn't seem hardly a minute before this car came. That is all I can say, that is all I remember."

As stated by Miss Akehurst, the plaintiff was enjoying the scenery along the public highway. The poles fifteen or eighteen inches in diameter upon each side of the railroad track at a distance not greater than one hundred and ten feet apart, with the wires strung upon them, extending for at least half a mile to the westward, locating the railroad and its crossing upon the highway and thus pointing out the place of danger of which Goodman had given notice to those in the automobile, including the plaintiff, were plainly visible at a point upon the highway some distance from the crossing, and it would seem that said poles and wires would have been noticed and observed by the plaintiff in the exercise of ordinary care and caution on her part to avoid the

threatened danger, but if they were observed by her she
made no mention of them. With these facts in evidence, we
think that the second prayer of the plaintiff, by which the
jury was instructed that there was no evidence legally suffi-
cient to show any negligence on the part of the plaintiff
directly contributing to the happening of the injury com-
plained of, should not have been granted.

The defendant's first, second, third, fourth, fifth, sixth and
B prayers we think were properly rejected, while in our
opinion its A and D prayers should have been granted, as
offered.

This brings us to the exceptions upon the admission of
testimony.

Dr. Tanner, a witness produced by the plaintiff, testified
that he attended the plaintiff immediately after the alleged
injuries were received by her in August, 1912, and that
upon her return to Baltimore for the trial of this case in
1913, he examined her and found her "in an extremely ner-
vous condition, typical traumatic neurasthenia," and that
she was suffering at such time from said trouble more than
she was at the time of leaving the city in September, 1912.
After testifying that he had heard the testimony of all the
witnesses in Court, he was asked, "Assuming that the testi-
mony be true, her condition before as compared with her
condition after the accident, to what do you attribute her
subsequent condition? Ans. To the injuries received at the
time of the accident. Q. In your opinion, is that permanent
or otherwise?" To this question the defendant objected, but
the objection being overruled, he was permitted to answer
that "It is permanent and progressive." This ruling of the
Court forms the first exception.

It is urged against the admission of this testimony that it
is uncertain and indefinite as to the condition referred to.
The witness had previously testified that when he first saw
her at the hospital she had a scalp wound on the left side
of her head, and her shoulder, arms, back and lower limbs

were bruised and discolored.  This is the extent of his description of her injuries at that time.  There can be no doubt, we think, that the condition referred to was the nervous condition which he found at the time of the examination a few days before the trial of the case and not to the wounds and bruises that he found immediately after the accident occurred.

The second, third, fourth and fifth exceptions relate to the testimony of Holmes, the assistant engineer of the appellant company, who was asked as to the unobstructed view of the tracks of the railroad looking eastward from the different points upon the highway north of the crossing and within the lines of the right of way of the defendant company.  We can discover no sufficient objection to the admission of this testimony, and, in our opinion, the Court erred in excluding it.

As to the sixth and seventh exception, we think the witness Elizabeth Krupp should have been permitted to answer the questions propounded to her, although we would not regard the error as a reversible one.

The judgment of the Court below will be reversed.

> *Judgment reversed, with costs to appellants, and new trial awarded.*