# MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* STATE OF MARYLAND, FOR THE USE OF ANNA CIRTOUT ET AL.

*Municipal Corporation—Defective Street—Absence of Barrier— Passenger in Vehicle—Contributory Negligence.*

In determining the necessity of erecting a barrier in order to make a highway safe for travelers, the true test is, not the distance of the dangerous object or place from the highway, but whether a traveler on the highway, exercising ordinary care, would be subjected to such imminent danger that a barrier is required to make the highway safe.                    p. 448

In an action for the death of one as a result of his fall over a declivity at the end of a street, while riding in motorcycle, *held* that there was evidence of negligence on the part of the city in permitting such a condition to exist without any protection to travelers by the erection of a barrier, or by signals or warnings of danger. p. 448

Prayers asserting a variance are properly rejected if they fail to state the variance with particularity. p. 449

In an action against a city for death caused by a fall over a declivity at the end of a street, a few feet beyond a certain point, it was proper to refuse to direct a verdict for defendant for want of evidence showing a dedication of the part of the street beyond such point, there being evidence of negligence on the part of the city in failing to erect a barrier or to place signals as a protection to travelers. p. 449

The contributory negligence of the driver of a public or private vehicle, not owned or controlled by a passenger, who is himself without fault, will not bar the right of the passenger to recover for injuries. p. 450

That it was at the request of deceased that he was taken out riding by the owner of a motor vehicle did not make the latter the agent of deceased and subject him to the control and direction of deceased as regards the operation of the vehicle so as to charge deceased with the owner's contributory negligence.
p. 450

In an action for the death of one while riding in another's vehicle, as a result of a fall over an embankment, *held* that, under the evidence, the mere fact that deceased failed to protest against the alleged negligence of the owner in the operation of the vehicle did not constitute negligence on the part of deceased contributing to the accident, as matter of law. p. 451

A person may testify as to his own age, and as to the age of a member of his family. p. 452

In an action for the death of one as a result of the fall of a vehicle in which he was riding, over a declivity at the end of a street, *held* that a question asked a witness as to the material of which the bed of the roadway was constructed was unobjectionable. p. 452

Error in permitting a question to be asked a witness was not prejudicial, if the question was not answered.                    p. 452

The refusal to allow defendant to ask certain questions of a witness on cross-examination is not a subject of review if the witness, when subsequently placed upon the stand by defendant, was permitted to answer fully all such questions.                    p. 452

· The exclusion of a question asked a witness is not prejudicial if the witness had previously answered the question.                    p. 452

·A question asked a witness who had testified to the ownership of land in front of a certain house, "It extends clear across the street, does it not?" was leading.                    p. 452

Hypothetical questions asked of an expert witness are properly excluded if they fail to include all the essential facts of the case upon which his conclusion should be based.                    p. 452

*Decided September 3rd, 1924.*

Appeal from the Superior Court of Baltimore City (HEUISLER, J.).

Action by the State of Maryland, for the use of Anna Cirtout and other infants, by Charles Bettus, their next friend, against the Mayor and City Council of Baltimore, a body corporate, and others. From a judgment for the plaintiff, said body corporate appeals. Affirmed.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and BOND, JJ.

*Allan Cleveland, Assistant City Solicitor,* with whom was *Philip B. Perlman, City Solicitor,* on the brief, for the appellant.

*James J. Lindsay* and *Abram C. Joseph,* with whom were *Daniel C. Joseph* and *James J. Lindsay, Jr.,* on the brief, for the appellees.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment against the Mayor and City Council of Baltimore in a suit brought under Lord Campbell's Act to recover for the death of John Cirtout, caused, as alleged, by the negligence of the Mayor and City Council of Baltimore. The equitable plaintiffs are his infant children.

The suit was brought not only against the Mayor and City Council of Baltimore, but also against John Kirschner, The Safe Deposit and Trust Company, trustee of the Christian Wilkens estate, and William Wilkens Company. The suit as to the Safe Deposit and Trust Company, trustee, was dismissed, and a verdict in favor of John Kirschner and William Wilkens Company was rendered by the jury.

In the trial of the case twenty-eight exceptions were taken to the rulings of the court. Of these twenty-six relate to the evidence, one to the prayers and special exceptions thereto, and one to the action of the court in overruling an objection to a statement made by Abram C. Joseph, of counsel for plaintiffs, in his argument to the jury.

The plaintiffs offered three prayers. The first and second were refused. The third, a prayer upon the measure of damages, was granted.

The city asked for twenty instructions. Of these, the eighth, ninth, tenth, eleventh, fifteenth, nineteenth and twentieth were granted; the others were refused.

At the time of his death John Cirtout was employed in the clothing factory of Henry Sonneborn & Son, Incorporated, and lived at 1852 McHenry Street, in the western section of the City of Baltimore, with his three infant children, Anna, Wanda and John, aged sixteen, ten and nine years, respectively.

On the 5th day of December, 1921, Charles E. Angel, "manager of supplies for the school board" of Baltimore City, with his friend, James Dixon, engaged in what he termed the "motor business, repairing motors," went to the home of John Cirtout, who, it seems, was a friend of both

Angel and Dixon. They arrived there about eight-thirty or nine o'clock in the evening. In going to Cirtout's home they rode upon their motorcycles, each having attached thereto his side car. When they reached there Cirtout was not at home. They, however, awaited his return, which was about one-half hour after their arrival.

In the course of the evening Cirtout asked Angel to take him out for a ride, and though the night was disagreeable, it being foggy and misty, they started out upon their ride, Angel upon his motorcycle and Cirtout in the side car attached thereto. They went west four blocks on McHenry Street to Bentalou Street, which crosses McHenry Street at or near its western terminus. McHenry Street is an improved street, curb and guttered, and paved with sheet asphalt to and beyond the west side of Bentalou Street the distance of thirteen feet, the width of the sidewalk of said last-named street. From this point the surface of the ground in what would be the bed of McHenry Street if extended further westward, is rough and uneven for a distance of about twenty-five feet to an abrupt drop or declivity therein of twelve or more feet.

The west curb of Bentalou Street, when it reaches McHenry Street, both from the north and the south, turns to the west, forming the north and south curbs of McHenry Street west of Bentalou Street for the distance to which McHenry Street is paved. To the west of Bentalou Street, beyond the point to which McHenry Street is paved, and on the north side of and facing what would be McHenry Street, if extended westward, are two dwelling houses. McHenry Street and Bentalou Street at their intersection are lighted by two lamps, one on the northeast corner and the other on the southwest corner of said streets.

When the motorcycle ridden by Angel reached Bentalou Street, traveling on McHenry Street, it continued its course across Bentalou Street and upon and over the paved portion of McHenry Street, west of Bentalou Street, and upon and over the rough and uneven ground to the west thereof to and

over the declivity mentioned, carrying with it the side car in which Cirtout was riding, which resulted in his death.

Angel in his testimony stated that "after we left the Cirtout house I drove west on McHenry Street, thinking the street kept on going. Being night—being misty and night time—I kept on past Bentalou Street, thinking the street continued out there, seeing two houses on the side and lamp posts—my spotlight showed nothing, and I knew something was wrong, but my front wheel was over the edge, and it was all over that quick."

The declivity over which the motorcycle and car went was, he thought, about twenty-five feet from the west curb of Bentalou Street. He stated the rate of speed at which he was riding was not over twelve or fifteen miles an hour; that he had upon his machine all the lights that he was by law required to display. In fact, he had, as he said, a spotlight which he was not required to have. This light shines on the surface over which the motorcycle passes, and when the light showed nothing ahead of him he put his foot on the brake and attempted to stop the machine, but he could not stop it. He further testified that there was no warning or signal of any kind indicating danger or any obstruction to prevent his going over the declivity.

Upon cross-examination he testified that when he passed from the asphalt pavement to the rough surface beyond, which was about twenty-five feet from the declivity, "he slowed down," and when his spotlight showed nothing he attempted to stop. He also testified that he thought the spotlight would show the surface of the road in front of him for a distance of sixteen feet, and when going at the rate of twelve or fifteen miles he could stop the motorcycle in three or four feet, and when asked why he could not have stopped it before going over the "bank," he said the ground was wet and his tires were "very smooth, the same as glass." Did you try to stop? "Certainly." He was then asked, if he could stop his motorcycle in four or five feet, why he did not stop? He answered, "I could not tell you that. The motor would

not stop, I suppose." He also stated that he saw, as he pro-
ceeded across Bentalou Street, two houses on his right, be-
yond that street facing McHenry Street, if extended. He
further said that prior to the accident he knew nothing of
the place at which the accident occurred or its surroundings;
that while his duties called him to that section of the city,
he was never, so far as he could recall, in that immediate
vicinity.

Lawrence J. McCleary testified that he for two years prior
to the accident had lived in the house on the northwest corner
of Bentalou Street and McHenry Street, one of the two
houses west of Bentalou Street, and that he there lived at the
time of the accident. He said the house in which he lived
and the one adjoining, on the west, faced south on McHenry
Street, with a well-defined sidewalk made of boards, not
curbed, extending along the entire distance in front of them;
that at the western end of the sidewalk, at or near the decliv-
ity mentioned, was a fence from the westernmost limit of
the second house across the sidewalk only; from that point
there was no fence or obstruction of any kind between Ben-
talou Street and the declivity upon what would be the bed
of McHenry Street if extended.

The witness also testified that about ten-thirty o'clock on
the night of the accident he went out of his house to close
the shutters and heard a noise down the embankment or
declivity nearby, and upon investigation found Angel and
Cirtout there, the former, at that time, lying in the side car
and the latter upon the ground. He did not hear the motor-
cycle and car pass the house, nor did he hear the noise made
by them in going over the declivity, and he did not know
how long they had been where he found them. He then
called his brother and the latter had the patrol wagon to come
for them, and both Angel and Cirtout were taken to the hos-
pital.

As we have said, the only instruction granted at the re-
quest of the plaintiffs was their prayer upon the measure
of damages, and to this the defendant, the Mayor and City

Council of Baltimore, filed special exceptions, because, as it was claimed, the prayer assumed (1) that Cirtout was negligently killed and (2) that such negligence was the negligence of the Mayor and City Council of Baltimore.

The city had paved the bed of McHenry Street to a point thirteen feet beyond the west curb of Bentalou Street, and had curbed the north and south sides of McHenry Street for a like distance beyond Bentalou Street. The point to which the city had paved and curbed McHenry Street west of Bentalou Street was at most not more than twenty-five feet from the dangerous drop or declivity where the accident occurred, and within that distance there was no barrier to prevent one traveling west on McHenry Street from going over the declivity immediately ahead of him; nor was there any sign or signal, warning him of danger at that place.

In addition to the facts above stated, a traveler going west on McHenry Street would not only see that the paved portions of that street extended beyond Bentalou Street and that the west curb of the last named street, as it reached McHenry Street, both from the north and the south, turned west, forming the north and south curbs of McHenry Street for the distance it extended, but there was visible to him on his right the two houses west of Bentalou Street facing on McHenry Street with the boarded sidewalks in front of them extending to or near the line of the declivity, from which he might be led to believe, in the absence of any thing to indicate that the street stopped at the end of the pavement, that McHenry Street continued in front of and beyond said houses, though not paved.

It is said in 13 *R. C. L.,* p. 421: "It is well settled that it is the duty of a municipal or *quasi* municipal corporation to erect railings or barriers along the highway and places where they are necessary to make the same safe and convenient for travelers in the use of ordinary care, and that it is liable for injuries to travelers resulting from a breach of its duty in this regard. This is true though the danger arises from structures or excavations outside of the highway,

and on the lands of adjoining owners, when they are in the
general direction of travel upon the highway. Whether or
not a railing or barrier is necessary in a given case depends
largely upon the circumstances of the particular locality in
reference to which the question arises. Among the facts
material to be considered are the character and amount of
travel, the character of the road itself, * * * the character and
extent of the slope or descent of the bank, the direction of
the road at the place, * * * whether the danger is concealed
or obvious, and the extent of the injury likely to occur
therefrom.

As was said in *Mineral City* v. *Gilbow,* 81 Ohio St. 263,
"In determining whether it is necessary in a particular case
that a barrier should be erected in order to make the high-
way safe for travelers thereon, the true test is not the distance
from the highway of the dangerous object or place, whether
it be much or little; but whether a traveler in passing along
the highway and exercising ordinary care would be subjected
to such imminent danger that it would require a barrier to
make the highway safe. *Kelley* v. *City of Columbus,* 41
Ohio St. 263, 268; *Alger* v. *City of Lowell,* 3 Allen (Mass.),
402, 405; *City of Norwich* v. *Breed,* 30 Conn. 544, 545."
And this Court in *Balto. & O. R. R. Co.* v. *Boteler,* 38 Md.
568, speaking through Chief Judge Bartol, said, quoting
approvingly from *Alger* v. *Lowell, supra*: "The true test is
not whether the dangerous place is outside the highway, or
whether some small strip of ground, not included in the way,
must be traversed in reaching the danger; but whether there
is such a risk of a traveler, using ordinary care, in passing
along the street, being thrown or falling into the dangerous
place, that a railing is requisite to make the way itself safe
and convenient."

Applying the law as stated to the facts above mentioned,
it cannot, we think, be properly held that there was no evi-
dence tending to show negligence on the part of the defend-
ant, the Mayor and City Council of Baltimore, in permitting
the conditions complained of to exist without protection to
those traveling on McHenry Street either by the erection

of a railing, fence or other barrier, or by proper signals or warnings of danger.

The court, in our opinion, committed no error in overruling the defendants special exceptions to the plaintiffs' third prayer.

The first, second, third, fourth, fifth and sixth prayers of the city asked for a directed verdict in its favor. The first, second and third of these, being variance prayers, were properly rejected as they do not state the variance complained of with sufficient particularity.

The verdict was asked for in the fourth prayer because of a want of evidence showing dedication of McHenry Street west of the building line of Bentalou Street. The ruling of the court in rejecting this prayer was in our opinion correct, in view of what has already been said as to the liability of the city.

The court by the city's fifth prayer was asked to instruct the jury that by the undisputed evidence it appeared that the motor-cycle in question was at the time of the accident driven by Angel in a reckless and negligent manner, and that Cirtout was riding in the side car at his own request, etc., therefore, their verdict must be for the Mayor and City Council as the undisputed evidence is that the said John Cirtout "did not protest" to Angel "against the reckless and negligent manner" in which Angel drove the motor-cycle with the side car attached.

By the city's seventh prayer the court was asked to instruct the jury that if they should find that Cirtout had asked Angel to take him for a ride on the occasion of the accident, and should further find that Angel drove the motor-cycle and side car for Cirtout in a reckless and negligent manner at such time, and should also find that Cirtout "made no objection to the manner in which the said Angel was operating said motor-cycle and side car, then the said John Cirtout was guilty of negligence which contributed to his own death, and their verdict must be for the Mayor and City Council."

In the fifth prayer the court was asked to hold open the facts therein stated, not leaving those facts to be found by the jury, that the plaintiffs could not recover because of Cirtout's failure to protest against the alleged negligence of Angel in driving the motor-cycle to which was attached the side car, in which Cirtout was riding. The seventh prayer differs from the fifth prayer only in the fact that the jury was to find the existence of said facts before finding thereon for the defendant, the Mayor and City Council of Baltimore.

This case falls within the rule that "the contributory negligence of a carrier, or of the driver of a public or private vehicle, not owned or controlled by the passenger, and who is himself without fault, will not constitute a bar to the right of the passenger to recover for injuries received." *P., B. & W. R. R. Co.* v. *Hogeland,* 66 Md. 163; *B. & O. R. R. Co.* v. *Strunz,* 79 Md. 343; *United Rys. Co.* v. *Biedler,* 98 Md. 574; *United Rys. & Elec. Co.* v. *Crain,* 123 Md. 332; *B. & O. R. R. Co.* v. *McCabe,* 133 Md. 219; *W., B. & A. R. Co.* v. *State, use of Hall,* 136 Md. 109; *McAdoo* v. *State, use of Kuntzman,* 136 Md. 452; *Chiswell* v. *Nichols,* 137 Md. 291; *Dorchester County* v. *Wright,* 138 Md. 577.

It is contended, however, by the appellant, that this case is not within the rule stated above, because, as claimed by it, Angel, in the operation of the motor-cycle, was the agent of Cirtout, and this claim, it seems, is based solely upon the fact that Angel took Cirtout out riding in his side car *at Cirtout's request,* and not upon the invitation of Angel without the request of Cirtout. In other words because of the request made by Cirtout, which was acceded to by Angel, who thereafter took him in his car for a ride, Cirtout was not a passenger within the rule, but that Angel, because of such request, became the agent of Cirtout and subject to his control and direction in the management and operation of the motor-cycle and car. The mere request of Cirtout to take him out riding, which was granted by Angel, could not have had the effect, claimed by the appellant, of changing the relation between the parties that would have existed had not such request been made. It in no sense made Angel the

agent of Cirtout or gave to the latter the control or management of the motor-cycle and car; and it cannot be properly held, under the evidence in this case that, as a matter of law, the mere fact that Cirtout failed to protest against the alleged negligence of Angel constituted negligence on his part, contributing to the accident, that would defeat the right of the plaintiffs to recover.

The sixth prayer in which the court was asked to treat Cirtout as not being a passenger at the time of the accident was also properly rejected for the reasons already stated.

The other rejected prayers of the defendant have been carefully examined and considered by us and without unnecessarily prolonging this opinion by a discussion of them we will state that we find no error in the court's rulings upon any of them.

The defendant's eighth, ninth, tenth, eleventh, fifteenth, nineteenth and twentieth prayers, as we have said, were granted. The law contained in these prayers was as favorable to the defendant as it could rightfully ask for, and thus we discover no injury done to the defendant by the court's rulings upon the prayers.

This brings us to the exceptions which relate to the evidence. The first, second, third, fourth and fifth exceptions were to the action of the court in permitting Annie Cirtout, one of the plaintiffs, and the oldest daughter of John Cirtout, to testify to the following facts, first, her own age at the time of her father's death two years before; second, that Wanda, one of the other plaintiffs, who, she had previously testified, without objection, was one of the two other children of her father, was her sister; third, Wanda's age at the time of her father's death; fourth, the age of her brother at such time; and fifth the age of her father at the time of his death. The sixth exception was to the court's ruling in permitting Wanda Cirtout, then, by her sister's statement, twelve years of age, to state her age at the time of her father's death.

The mother of the plaintiffs died several years before the death of the father, and at the time of the trial the plaintiffs had no relatives in this country. The witness, Annie Cirtout,

had at the time of her father's death the management of the home and the care of her younger sister and brother, and at the time of the trial she, as stated by her, had reached the age of eighteen years. Wanda was two years younger, while the brother was much their junior.

The rule now seems well established that a person is a competent witness as to his own age. This rule is recognized not only by some of the most eminent text-writers (*Wigmore, Evidence*, sec. 667; 2 *Jones, Evidence*, sec. 303), but by many of the courts of this country in a variety of cases both civil and criminal.

The rule was followed in *Koester* v. *Rochester Candy Works*, 194 N. Y. 92, where the complaint charged the defendant with employing the plaintiff, who at the time was an infant under the age of fourteen years, in the operation of dangerous machinery, not protected by proper safeguards, in violation of the labor law of that state. The court in that case, speaking through Chief Justice Cullen, said, it is claimed that a person is not a competent witness as to his own age. While I can find no express decision in this state that a witness may testify to his age, as far as my experience goes the practice has been universal to permit such testimony, and I have never heard its competency challenged. The question has been, however, the subject of determination in many other states and the authorities seem to be uniform that the witness is competent. *Hill* v. *Eldridge*, 126 Mass. 234; *Comm.* v. *Stevenson*, 142 Mass. 466, 8 N. E. 341; *Hancock* v. *Supreme Council etc.*, 69 N. J. L. 308, 55 Atl. 246; *Choever* v. *Congdon*, 34 Mich. 296." To the same effect are the cases of *Pearce* v. *Kyzer*, 16 Lea. (Tenn.), 521; *Houlton* v. *Manteuffel*, 51 Minn. 185; *Morrell* v. *Morgan*, 65 Cal. 575, and other cases in note to *Koester* v. *Rochester Candy Works*, *supra*, in 16 Ann. Cas. 589. Not only may a person's age be testified to by himself, but it may also be testified to by members of his family. *Wigmore, Evidence*, sec. 667; *Jones, Evidence*, sec. 302, and cases cited in note thereto. Upon the authorities stated the trial court was, we think, right in permitting both Annie and Wanda Cirtout to testify to their

respective ages and in allowing the former to testify to the ages of her father, sister and brother.

In the seventh exception Angel was asked "what was the bed of the roadway from 1800 block to Bentalou Street." This question was objected to and the objection overruled. We can discover no possible error in this ruling of the court.

The question objected to in the eighth exception does not appear from the record to have been answered, consequently no injury was done the defendant.

The ninth, tenth, eleventh, twelfth, thirteenth, fourteenth and fifteenth exceptions were to the rulings of the court in not permitting Einolf, a policeman, placed upon the stand by the plaintiffs, to answer, upon cross-examination, certain questions as to Angel's sobriety when found and taken to the hospital. We need not pass upon these rulings as Einolf was subsequently placed upon the stand by the defendant and permitted to answer fully all of said questions.

We have found no reversible error in the court's rulings in the sixteenth exception; and its rulings were correct in the seventeenth and eighteenth exceptions. The witness in the nineteenth exception had previously answered the question excluded therein, consequently no injury was done the defendant in the court's rulings thereon.

In the twentieth exception the occupant of one of the houses west of Bentalou Street facing southward, after stating that one Kirschner owned the land in front of said house, was asked, "It extends clear across the street, does it not?" This question was not only leading, but the evidence sought to be elicited by it was, we think, immaterial if not irrelevant, in view of what we have already said as to the liability of the city; in any event, with the facts then in evidence, the exclusion of it did not constitute a reversible error, and the same may be said of the twenty-first and twenty-second exceptions.

The twenty-third, twenty-fourth, twenty-fifth and twenty-sixth exceptions were to the rulings of the court sustaining objections to certain hypothetical questions asked Dr. Schaffer, an expert witness. These questions were properly ex-

cluded, if for no other reason, because they failed to include within them all the essential facts of the case upon which his conclusion should have been based; and we also find no reversible error in the court's ruling in the twenty-eighth exception.

As we find no reversible errors in any of the rulings of the court the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*