CHARLES T. DASHIELL, JR. *v.* J. REGINALD
MOORE

[No. 35, January Term, 1940.]

658

*Decided March 5th, 1940.*

The cause was argued before BOND, C. J., OFFUTT, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*E. Dale Adkins, Jr.,* with whom were *L. Creston Beauchamp* and *Woodcock, Webb, Bounds & Travers* on the brief, for the appellant.

*John William Long, Harry C. Dashiell,* and *Long & Robins,* submitting on brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

J. Reginald Moore, the equitable plaintiff, appellee here, was on November 6th, 1938, injured in a collision between an automobile in which he was a guest passenger, operated at the time by Charles T. Dashiell, Jr., a mule, astray on the state highway between Salisbury and Princess Anne, in this state, and another automobile.

Subsequently, Moore, an infant, brought this action through his mother and next friend against Dashiell to recover compensation for his injuries, on the theory that they were caused by Dashiell's negligence. The trial resulted in a verdict and judgment for the plaintiff, and from that judgment this appeal was taken.

It presents two questions, one, was the evidence in the case legally sufficient to support an inference that plaintiff's injuries were caused by defendant's negligence, and, two, if it was, did the uncontradicted evidence in the case establish as a matter of law the fact that negligence of the equitable plaintiff, herein for brevity called the plaintiff, contributed to the accident which caused the injuries. The first and only exception relates to the refusal of defendant's first, second, and third prayers, which sought a directed verdict for the defendant.

The evidence in the case was sufficient to support a finding of these facts:

On the day of the accident Moore's brother had occasion to drive from Cambridge to Princess Anne. The plaintiff, and a friend, Reginald Porter, both nineteen years old, went with him, apparently for the trip and the drive. When they reached Salisbury, the brother left the plaintiff and Porter there, and he went to Princess Anne. The two boys loafed around Salisbury for several hours, and then, tiring of its diversions or the lack thereof, decided to go to Princess Anne to meet Moore's brother, and drive home with him from there. They apparently had no means of getting there other than "hitchhiking," so they stationed themselves on the state road leading to Princess Anne with the purpose of getting a free ride to that town. After waiting a half hour they were about

to give up the plan when Dashiell came along and asked them if they were "going down." They asked him how far he was going, and he told them "to Quantico." Moore then said that they were going to Princess Anne. They then got into Dashiell's automobile, a one-seated Ford coupé, and proceeded towards Princess Anne, Dashiell sitting on the left, driving, Moore sitting next to him on his right, and Porter on Moore's right. That was between five-thirty and six o'clock in the afternoon, the day was clear, and the road was dry. Dashiell's car was equipped with a radio and, a short distance south of the line dividing Wicomico and Somerset counties, he attempted to manipulate the radio dial located in the center of the dash board just below the windshield, and while so engaged the car struck a mule astray on the road, and as a result of that collision was deflected from its course and caused to collide with another automobile going north, which was driven by Herbert A. Holland, Jr.

The lights on Dashiell's car were in good condition, and were turned on at the time. He was driving on the right side of the road at about forty-five miles an hour, a lawful speed, the road was straight and level, so that the only negligence charged is his failure to discover the mule in time to avoid the collision.

At the time of the accident Dashiell was engaged in changing the stations on the radio. To do that he leaned forward and in doing so obstructed Moore's vision. Neither Moore nor Porter saw the mule before the collision. Porter said that he did not see it because he was watching Dashiell's manipulation of the radio dial.

Moore, in his testimony, said:

"While he was changing the dial or the station on the radio, what were you doing? A. Mr. Porter and myself were both smoking and watching him. I could not see, more or less, because he was bent over slightly in front of me. Q53. You only know that he was bent over slightly in front of you? A. Yes, sir. Q54. That is the last you recall? A. Yes, sir. * * * Q73. Are you able to estimate how long Mr. Dashiell had been working on the

dial of his radio or in the act of changing stations just before this accident? A. A few moments. Q74. What do you mean by moments? A. Around ten seconds I would say, or a little longer. * * * Q6. The radio was going when you got in the car? A. Yes, sir. Q7. And about ten seconds before the crash he undertook to change the station? A. I won't say just exactly ten seconds. Q8. That is the best you can estimate it, is it? A. Yes, sir. Q9. He then undertook to change the stations? A. Yes, sir. Q10. Were you looking at the dial while he was changing the station? A. I could not see it because he was more or less in front of me. Q11. He was also between you and the road. He obstructed your vision down the road? A. Yes, sir. Q12. You were sitting in the seat, then came Mr. Dashiell leaning over in front of you, then the open windshield in front of him, is that right? A. Yes. Q13. All you could see was the back of his head? A. I could see around it, but not clearly. Q14. You could not see into his face? A. No, sir. Q15. His face was in front of you? A. I could get a slight side view of him, but that is all. Q16. Did you make any protest about him changing the radio at that time? A. No, sir. Q17. You didn't have any objection to it? A. No, sir. Q18. You saw nothing wrong with doing it at that time? A. No, sir. Q19. When you said the road was open and clear in front of you you meant on the right-hand side, didn't you? A. Yes, sir. Q20. You didn't mean to say there were no cars coming towards you on the left side of the road? A. That I don't recall. Q21. You don't recall whether there was or not? A. No, sir. Q22. What I meant to say, you don't mean to say there were not any cars coming on the left? A. No, sir. Q23. As a matter of fact, you have learned since you really crashed into a car—Mr. Holland's car? A. Yes, sir."

Neither Porter nor Moore saw any north bound cars approaching, although Dashiell said that he saw two cars coming north, and that the accident occurred just as he met the first of these two cars. Holland, who was driv-

ing the second of those two cars, said that the accident happened as the first car met Dashiell's car, that he had seen Dashiell's car approaching "some distance off," that he heard a crash "and the headlights went out," and the car swerved towards him, that he pulled as far as he could to the right, but in spite of anything he could do the other car struck his car and stopped some thirty or thirty-five feet south of it. He saw the car in front of him stop just before meeting the Dashiell car, and pull off on the dirt shoulder on the extreme right or east side of the road, and then go on, and he assumed from what he later learned that it had stopped to avoid the mule, although he never saw the mule until after the accident. He also saw the car ahead of him stop after the accident, and speaking of its occupant he testified: "He got out of the car, or opened the door and looked back, shut his door and went on up the road." When the lights on the Dashiell car "went out," the witness was about a hundred feet away, but he did not see the mule until after the Dashiell car finally stopped, and then the mule was under it.

M. T. Bohler, a member of the Maryland State Police, arrived at the scene at about 6:15 P. M. He found that "the right side of that automobile was not damaged. That was the side next to the ditch. The entire front of the car was damaged. The automobile was mashed in, headlights broken, fenders in front mashed down, hood bent; something had hit the windshield, breaking back the brackets of the windshield, mashed in the top. The left side of the car was damaged. The left front fender, running board, rear fender, left front wheel. The tire was flat and the wheel was bent. The bumper was bent down but I don't think broken off. It was my assumption from the hair and blood, that it had struck a mule. I say that because the mule was lying under the car when I arrived at the scene of the accident, and was dead at that time. At that time no part of the mule was on the automobile, except as I stated before, some hair and blood was on the car. That was on top

of the radiator and up against the windshield, the windshield frame. I found glass from the headlights of the car on the road about sixty feet from where the mule was lying." He also testified that he found mule tracks on the west side of the road, but none east of it.

At the point of the accident the concrete surface of the road is twenty feet wide, on either side of the concrete a dirt shoulder about six feet wide, and beyond that, on the west side about seven feet from the concrete surface of the road, there is a ditch about three feet wide and from eighteen to twenty four inches in depth, and beyond the ditch a field, and beyond the shoulder on the east side there is a railroad right of way, separated from the highway by a "small area; wouldn't be called a field."

Dashiell testified that he saw the two cars approaching, but that he did not see the mule; that as the first or leading car met him the crash occurred, and he knew nothing more until he became conscious in the hospital. He said that while he was changing the stations on the radio, he kept his eyes on the road ahead, and was not looking at the dial at all, that it was off balance so that it was useless to read the numbers on the dial, and that he was so familiar with its operation that he could find the tuning knob by touch without glancing at it.

This is a typical hitchhiking case, an exponent of a growing volume of litigation growing out of accidents to self invited guests in automobiles on the public highways. The custom of seeking free rides is so widely and firmly established, that it has not only added a new word to the language (*Winston's Dictionary*), but it has even a sign language of its own. Dashiell said: "I thought these two young men waved me down. I stopped. It wasn't a thumb like this; it was down in front of them. I am motioning my thumb in what is known as the hitch-hike motion, and in response to that I stopped."

The custom and its incidents are in this state affected by no statutory rule, but are governed solely by the common law rule that one whose fault causes injury to an-

other who is himself free from fault is subject to liability to the person injured.

Briefly re-stated, its facts are that Dashiell, yielding to the invitation of the speaking thumb, stopped, and yielding to a kindly and generous impulse, took the two boys waiting by the roadside into his automobile to give them a free ride to their destination. While he was driving on the right side of the road at a lawful speed, suddenly his car crashed into a mule astray on the road, and he knew no more until he found himself later in a hospital. He was at the time manipulating a radio, but he said that his eyes were not on the radio but on the road at all times, and that he did not see the mule before the crash. Nevertheless, if the evidence permits a rational inference that by the exercise of ordinary care he could have seen it in time to have avoided the collision, the conclusion is inevitable that he is subject to liability for the harm caused by his inattention.

There is no direct evidence that he could have seen the mule before he struck it. Holland coming from the opposite direction failed to see it, and neither of the boys saw it, but one of them said that he was looking at the dial and not at the road, and the other that Dashiell's head and body obstructed his view. So that the only evidence to support the inference that he could have seen the mule before his car struck it, had he used ordinary care, are the facts that the mule was in the road when he struck it directly in front of his car, that his lights were in good condition and were on at the time, that another car coming from the opposite direction stopped just before it reached him and turned out as though for an obstruction, and that at the time of the impact he was manipulating his radio.

So that the question is, are those facts legally sufficient to support the conclusion that had Dashiell exercised ordinary care he could have seen the mule before he struck it, and the valuation of the evidence in connection with that issue is a matter of law, rather than of fact, and the court is bound by its own decisions, and in-

fluenced by the decisions of other courts as to the legal value given similar facts in other cases.

Whether the plaintiff was an invited guest or a guest at sufferance is not material in this case, for the evidence permits a finding that he was an invitee, and if he was an invitee the defendant was bound to use reasonable care to avoid injuring him. 5 *Am. Jur.* 629; *Fitzjarrell v. Boyd,* 123 Md. 497, 91 A. 547; 20 *A. L. R.* 1014; 26 *A. L. R.* 1425; 40 *A. L. R.* 1338; 47 *A. L. R.* 327; 51 *A. L. R.* 581; 61 *A. L. R.* 1252; 65 *A. L. R.* 952; *L. R. A.* 1916E, 1190; *L. R. A.* 1918D, 205; 5 *Am. Jur.* 626; *Lavine v. Abramson,* 142 Md. 222, 227, 120 A. 523.

It is settled law in this state that one will not be permitted to say that he looked and failed to see what he must have seen had he looked. The mule's neck and left front leg were broken, its neck was torn, and there was a "bad laceration or tear on the front side of its two front shoulders, right above its legs." It may be inferred from the location of those wounds that it was facing the automobile when it was struck. It was a large mule, weighing twelve or thirteen hundred pounds, the whole front of the car, its left fenders and running board and left front wheel were damaged, the bumper bent down and hair and blood on the radiator and near the windshield, and the top of the car was mashed in "as though the car had gone under the mule and the mule had gone up over the radiator and hood." It may be inferred from those facts that when the collision occurred the mule was facing the automobile, and that the collision was head on. It is also a rational and a reasonable inference that had the defendant looked he could not have failed to see so large an object as a thirteen hundred pound mule, which was there to be seen directly in front of his car and directly in front of his headlights, at some distance before the collision. It was undoubtedly there, it was not invisible, and yet he said that he never saw it at all before the collision, at the time of the collision, or afterwards. It is not an unreasonable inference, therefore, that he could not have been looking ahead

when he was adjusting the radio, or, if he was, that his bent position prevented him from seeing the road directly in front of him. In *Huddy on Automobiles,* sec. 371, it is said: "It may be stated as a general rule that the driver of an automobile is charged with notice of such conditions in and along the road as he should have seen. In other words, he is conclusively presumed to have seen such surrounding circumstances as he would have seen had he properly exercised his faculty of vision. The duty to look implies the duty to see what is in plain sight unless some reasonable explanation is shown. Where there is nothing to obstruct the vision of a driver, it is negligence not to see what is clearly visible."

In *Williams v. State,* 161 Md. 39, 155 A. 339, 345, after holding that there was sufficient evidence to support a finding that the plaintiff's decedent was struck and killed by an automobile driven by the defendant over and along a public highway at night, it was held that whether defendant's failure to discover the plaintiff in time to avoid striking him was negligence was a jury question. In announcing that conclusion the court said: "He said he saw no one in front of him and that 'he could see the road.' Maybe he could, but, with the night making a black wall on his immediate right and his view in front obscured and his sight blinded by the lights of the approaching car, it can easily be believed that he could not see any one on the edge of the road. It is just the condition which makes night driving dangerous, and on a much-traveled way is a menace of frequent occurrence. * * * When the vision of a driver of a car is so obstructed or obscured by the bright lights of a car approaching from the opposite direction that he cannot see any one in the road in front of him, it is the duty of a driver in the exercise of ordinary and reasonable care to increase his diligence to avoid injury to any one who might rightfully be on the road in front of him."

In *Dauplaise v. Yellow Taxicab Co.,* 204 Wis. 419, 235 N. W. 771, 772, the plaintiff, a passenger in a taxicab, was injured as the result of a collision between the cab

and a mule astray on the highway. The accident occured at night, and in supporting a finding of negligence the court said:

"The night was clear; the taxi lights were in perfect condition; the driver's vision was not in any manner interfered with. There was no other traffic on the highway and nothing to divert the driver's attention or to require him to look in a direction other than the direction in which he was traveling. His lights were of such intensity as to permit him to see ahead 150 to 200 feet and twenty-five to the side of the road. The driver testified that he did not see the mule until it jumped out of the ditch immediately in front of his taxi.

"In this state of facts it seems clear that the jury was permitted reasonably to infer that at the time of the accident the defendant was not maintaining a proper lookout. We think that the jury was permitted to infer from the proven facts and circumstances that if the driver had maintained a proper lookout he would have seen the mule at the side of the road for some considerable time before the collision. His failure to see the mule until he hit it, under all of the circumstances, was evidence which permitted the inference that he was not maintaining a proper lookout."

See also 5 *Am. Jur., "Automobiles,"* secs. 263, 265.

In *Benson v. Anderson,* 129 Wash. 19, 223 P. 1063, 1064, the plaintiff while pushing a bicycle over a bridge at night was struck and injured by defendant's automobile. Holding that negligence might be inferred from those facts the court said: "While the time of the accident was between the hours of eight and nine o'clock at night, the bridge was fairly well lighted with artificial lights, so that an object of the size of a man could be seen for a considerable distance ahead, and it was a just inference for the jury to draw that, had the appellant exercised the usual and ordinary vigilance, he could have discovered the presence of the respondent in his path in time to avoid him. It is true there were a number of automobiles on the side of the bridge going in the

opposite direction, and that the lights from these made it difficult to observe objects in front of the appellant. But this only called for a greater care on his part."

Holding that he could have seen the mule had he kept a proper lookout, his failure to keep such a lookout was sufficient to support a finding of negligence.

He was driving at the time at a relatively high rate of speed in the open country on the main highway between two towns which were also county seats. He should have expected to find a substantial volume of traffic on the road, and he should also have anticipated that he might, on a road running through farming country, find animals astray thereon. He should also have considered that an automobile travelling at the rate of sixty feet per second is a highly dangerous instrumentality, and to avoid disaster one driving at that speed must be vigilant at all times to detect danger, and ready to act instantly to avoid it. 44 *A. L. R.* 1043; *Lauson v. Fond du Lac,* 141 Wis. 57, 123 N. W. 629.

The operation of automobiles on public highways at extremely high and dangerous rates of speed is not only lawful but commonplace, and the automobile itself is such a common and familiar object that its deadly and destructive character when operated at such speeds is often overlooked, although the annual toll of the dead and the maimed would seem to make their potentially dangerous character obvious enough. But because they are so universally used, the public safety and general welfare charge those who do use them with knowledge of their dangerous and deadly nature, and impose upon them the peremptory and inflexible duty of exercising at all times and under all circumstances reasonable care to so operate them as to avoid injury to others.

An automobile driven at forty-five miles an hour on a public highway is no place for day dreams, for play, for debate, or for any other act or conduct which will divert the operator's attention from the business of driving safely (5 *Am. Jur.* 599, 652 *et seq.; Blashfield, Encyc. of Automobile Law* (1927 Ed.), pp. 286-289; *Huddy on*

*Automobiles*, sec. 367, *Pearson v. Lakin*, 147 Md. 1, 127 A. 387), and it has been held that even a moment's inattention may be characterized as negligence. *Linzmayer v. Phair*, 156 A. 918, 9 N. J. Misc. 1154; 42 *C. J.* 909.

If Dashiell was negligent in failing to discover the mule in the road in time to avoid a collision with it, the inference that that negligence was the proximate cause of the accident is not unreasonable. Collision with the mule undoubtedly caused the accident. If he had seen it when he should have seen it, it may be inferred that he could have avoided hitting it, so that it may also be inferred that his failure to see it in time was the direct and proximate cause of the accident.

There was no error, therefore, in the refusal of the defendant's first and second prayers, which raised the issue of primary negligence.

His third prayer asked that a verdict for the defendant be directed on the theory that the uncontradicted evidence showed that the plaintiff's own negligence contributed to the injury. Without reviewing the numerous cases which deal with the rule invoked by that prayer, it may be said that such a prayer ought not to be granted unless the whole evidence in the case permits no rational inference other than that some negligent act or conduct of the plaintiff contributed proximately and directly to the happening of the accident. To justify such a characterization, the acts or conduct relied on in support of it must have been so distinct and decisive that there could be no room for difference of opinion among persons of ordinary intelligence as to their tortious quality, and that they did contribute directly and proximately to the happening of the accident. In dealing with the establishment of contributory negligence as a matter of law, the truth of all evidence tending to support the plaintiff's case, and all inferences which may reasonably be deduced therefrom, must be assumed. *Provident Trust Co. v. Massey*, 146 Md. 34, 41, 125 A. 821; *Balto. & O. R. Co. v. Belinski*, 106 Md. 452, 455, 67 A. 249; *Barker v. Whittier*, 166 Md. 33, 38, 170 A. 578; *Aetna Casualty & Surety Co.*

v. State, etc., 162 Md. 49, 55, 56, 158 A. 45; *Friedman v. Hendler Creamery Co.*, 158 Md. 131, 147, 148 A. 426; *Tri-State Engineering Co. v. Graham*, 158 Md. 328, 332, 148 A. 439.

Applying that rule to the facts of this case, it seems fairly obvious that they require no conclusive inference that any negligence on the part of the plaintiff contributed directly and proximately to the happening of the accident in which he was injured, and the prayer should have been, as it was, refused.

He was a guest in the defendant's car, either as an invitee or at sufferance, but in either case he was there for his own convenience and not that of Dashiell, who was a stranger to him. Even if he had known that Dashiell was about to change the station on his radio, it would be unreasonable to hold that he was guilty of negligence as a matter of law because he did not instantly, in the few seconds that passed while Dashiell was manipulating the radio, say to his host, in whose car he was a guest, "You must stop that, you must not play with your radio and drive at the same time." He said that he could not see the radio dial, nor could he see whether Dashiell was or was not looking at the road ahead of him. Nor can he be charged with negligence as a matter of law because he did not see the mule. Both Porter and Dashiell could have seen it had they looked, but it is possible that he could not because Dashiell was bent over in front of him, so as to obstruct his view to his left.

The driver appeared to be competent and skillful, he was driving at a lawful rate of speed, the plaintiff was in no position to know that the driver was not looking ahead, and it is consistent with the evidence that because of Dashiell's position the plaintiff was unable to detect the danger before the accident happened. Those facts are not sufficient to compel the conclusion that he was guilty of negligence as a matter of law.

A guest occupant of an automobile is not held to the same degree of vigilance and caution as the driver, nor,

672

to avoid the imputation of negligence, must he constantly divert the driver's attention by warnings of dangers which must be quite as apparent to the driver as to the guest, unless the operation of the car or the conduct of the driver would indicate to an ordinarily intelligent person that the driver was incompetent, inattentive, reckless, or indifferent to his own or his guest's safety. If such a guest is or should be aware of approaching danger, and is aware that the driver is doing nothing to avoid it, and has reason to believe that an accident will occur unless the driver acts promptly, and fails to warn him, he is negligent. But the nagging advice of timid and nervous persons colloquially described as "back seat drivers" (*Winters v. York Motor Express Co.*, 116 Pa. Super. 421, 176 A. 812, 815), possibly causes more accidents than it prevents. *Ibid.* The degree of vigilance and care which the guest is required to exercise for his own protection is not different from that required of the driver (5 *Am. Jur.*, "*Automobiles*," secs. 475, 483), he is more than "mere freight" (*Ibid*, sec. 479; *White v. Portland Gas & Coke Co.*, 84 Or. 643, 165 P. 1005), and must himself exercise reasonable care to discover danger, and if he does or should discover danger, and is aware that it is due in whole or in part to the manner in which the car is operated, or to the conduct of the driver, it is negligence for him to sit supine and indifferent without warning or protest. 5 *Am. Jur., Automobiles,* secs. 478, 479. On the other hand, if the situation is such as to indicate to a reasonably intelligent person that interference is likely to increase rather than lessen the danger, he is under no duty to interfere. 5 *Am. Jur., Automobiles,* sec. 476. What will amount to reasonable care in a given situation is a matter of judgment and common sense, and is governed by no general rule applicable to all cases, but ordinarily is to be determined by a jury in the light of all the surrounding facts and circumstances. *Ibid; Wash., B. & A. R. Co. v. State,* 136 Md. 103, 111 A. 164; *Lavine v. Abramson,* 142 Md. 222, 120 A. 523; 42 *C. J.* 1171-1175; *State v. Phillinger,* 142 Md. 365, 373, 120 A.

878; *Montgomery Bus Lines v. Diehl*, 158 Md. 233, 238, 148 A. 453; *State, use of Shipley v. Lupton*, 163 Md. 180, 192, 161 A. 393; *Yellow Cab Co. v. Lacy*, 165 Md. 588, 170 A. 190; *United Rwys. Co. v. Crain*, 123 Md. 332, 351, 91 A. 405; *Balto. & O. R. Co. v. McCabe*, 133 Md. 219, 104 A. 465; *McAdoo v. State*, 136 Md. 452, 464, 111 A. 476; *Baltimore v. State*, 146 Md. 440, 451, 126 A. 130; *Pearson v. Lakin, supra; Chesapeake & Pot. Tel. Co. v. Merriken*, 147 Md. 572, 578, 128 A. 277; *Kent County v. Pardee*, 151 Md. 68, 76, 134 A. 33; *Balto. C. & A. Ry. Co. v. Turner*, 152 Md. 216, 229, 136 A. 609.

Finding no error in the rulings of the trial court, the judgment from which this appeal was taken must be affirmed.

*Judgment affirmed, with costs.*