81 A.3d 584

**Rigoberto E. Domingos AYALA, et al.**

v.

**Robert Frederick LEE, et al.**

**No. 1288, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Dec. 18, 2013.

458

Kevin J. McCarthy (McCarthy, Winkelman & Morrow, LLP, on the brief) Bowie, MD, for appellant.

Daniel J. Moore (Scott D. Goetsch, Joel D. Newport, Moore & Jackson, LLC, on the brief) Towson, MD, for appellee.

Panel: ZARNOCH, GRAEFF, JAMES P. SALMON (Retired, Specially Assigned), JJ.

ZARNOCH, J.

This case presents two key issues for resolution: (1) Can a driver be found negligent if an accident occurs when his truck crashes into a parked vehicle but the apparently healthy driver has no memory of the accident? and (2) Is a plaintiff's status as an undocumented immigrant[1] relevant and admissible evidence in this personal injury action?

Appellants Rigoberto E. Domingos Ayala and Jose R. Rodas Santacruz were working for Ebb Tide Tents and Party Rent-

---

1. Like the General Assembly, we use the term "undocumented immigrant" instead of any reference to "illegal" status. *See* Md.Code (1978, 2008 Repl.Vol., 2013 Supp.), Education Article, § 15–106.8(a) (exempting undocumented immigrant individuals from paying the out-of-state tuition rate at state community colleges if residential requirements are met). This choice is also in line with recent convention. *See, e.g.,* Audrey J.S. Carrión & Matthew M. Somers, *A Case for the Undocumented Immigrant,* Maryland Bar J., July/Aug.2011, at 30; Paul Colford, *"Illegal Immigrant" No More,* Assoc. Press (Apr. 2, 2013), http://blog.ap.org/2013/04/02/illegal-immigrant-no-more/.

als ("Ebb Tide") when they were involved in a motor vehicle accident. The truck driven by appellee Robert F. Lee, holder of a commercial driver's license, on behalf of his employer Bay State Pool Supplies of Baltimore, Inc. ("Bay State"), collided with Ebb Tide's parked truck, resulting in severe injuries to Ayala and Santacruz. Ayala, Santacruz, and Imelda Carolina Chavez Ventura, Ayala's wife, sued Lee and Bay State for negligence. A six-day jury trial resulted in a jury verdict for Lee and Bay State, which appellants now ask us to reverse. We agree with appellants and therefore we reverse the judgment and remand for further proceedings.

## FACTS AND LEGAL PROCEEDINGS

Ayala and Santacruz were working for William Edward Comegys, Jr., then the owner of Ebb Tide, on September 27, 2010. Comegys was driving the three of them from the company headquarters to a job site in Annapolis and was traveling westbound on Route 50. It was raining, and the truck's windshield wipers stopped working at some point during the drive. After crossing the Bay Bridge, Comegys stopped the truck and pulled over to the right hand shoulder of Route 50. The vehicle was fully out of the travel lanes, with the two right wheels on the grass and the two left wheels on the paved part of the shoulder. The emergency flashers were also on. Comegys, Ayala, and Santacruz all exited the truck and went to work on the windshield wipers. They had just fixed the wipers and were standing in front of the vehicle when suddenly their truck was struck from behind by the truck owned by Bay State and operated by Lee. Comegys was killed as a result of the impact. Ayala and Santacruz survived, but suffered serious and permanent injuries to their lower extremities.

Ayala, Santacruz, and Ventura filed a complaint against Lee and Bay State in the Circuit Court for Anne Arundel County on November 3, 2010.[2] Ayala and Santacruz each alleged

---

2. Appellants filed several amended complaints throughout the course of the litigation, culminating in a third amended complaint filed on

counts of negligence against Lee and Bay State (Counts I and II) and counts of negligent entrustment and hiring against Bay State (Counts III and IV).[3] Ayala and Ventura also claimed loss of consortium against Lee and Bay State (Count V). The damages sought included past and future medical expenses, loss of income, and loss of earning capacity.

It became obvious even before trial that Ayala and Santacruz's immigration status would be at issue. Ayala and Santacruz are originally from El Salvador. In 2006, they entered the United States through Texas without presenting themselves to federal immigration authorities. They eventually settled in Maryland. Each acquired a Social Security Number and used it to get a permanent resident card, seek employment, and pay taxes. However, each Social Security Number was acquired illegally. Ayala and Santacruz are therefore undocumented immigrants.[4]

Appellants moved to exclude evidence of their immigration status at trial in a written motion filed on April 26, 2012. The circuit court considered this and other motions *in limine* at a hearing on May 29, and ruled that immigration status was relevant and admissible evidence. Because Ayala and Santacruz asked for income-based damages, the circuit court reasoned that they had opened the door to inquiries about their immigration status. In the court's view, there was a valid question over whether or not a plaintiff could legally earn the income he was claiming in damages. The court also found that the fact that Ayala and Santacruz had misrepresented

---

February 21, 2012. Comegys' wife also filed a wrongful death action on June 7, 2011, in her individual capacity and as the personal representative of Comegys' estate. Bay State and Lee settled with Comegys' estate prior to trial.

3. The circuit court granted appellants' motion to dismiss the negligent entrustment and hiring counts on the fourth day of trial.

4. Appellants applied for asylum in May 2012 and had not yet received a ruling on their applications by the time trial occurred in August. There is no evidence of progress on the applications in the record before the Court.

their immigration status on employment forms was relevant to their credibility. Accordingly, at the August 2012 trial, the jury heard extensive testimony from Ayala and Santacruz on their legal status and how they came to the United States. Indeed, the second question asked of Ayala during cross-examination was: "You do not have a Social Security Number issued to you by the United States Government?" Counsel for Bay State and Lee also asked almost every other witness questions related to appellants' immigration status.[5]

Ayala and Santacruz also testified about their injuries as a result of the accident and how those injuries had affected their ability to work. They called expert witnesses to corroborate their testimony, including the orthopedist who treated them, a rehabilitation specialist, and an economist. The Maryland State Troopers who had responded to the accident also testified. They described the work they did to reconstruct the accident scene, which showed that the front right corner of the Bay State truck hit the back left corner of the Ebb Tide truck. There was no damage to any other part of the Bay State truck. The officers also testified that the conditions that day included some rain but no obstructions to vision or any construction along that portion of Route 50.

Lee and Bay State relied on testimony from their own medical expert, who testified that Ayala and Santacruz's injuries were less severe than they claimed, and video evidence from an investigator who had recorded Ayala and Santacruz performing various day-to-day activities. They also present-

---

5. For example, defense counsel asked one of appellants' expert witnesses: "If it is not legal for [appellants] to hold a job in the United States in the future, then your analysis really doesn't apply, does it?" Counsel later asked appellants' expert economist: "So you didn't know when you wrote your report back in November that neither of these gentlemen had entered the country legally, correct?" Even the circuit court independently raised some immigration-related issues. In discussing appellants' medical expert's testimony on future medical needs, the court stated: "I guess he might testify that following procedure X might be needed in three years out. The Defendants might say, [']Well, wait a second. Do you have any knowledge as to whether that procedure is available [outside of the United States]?[']"

ed, over objection, the de bene esse deposition of the woman who had been lawfully issued the Social Security Number Ayala was using. Absent from the trial, however, was Lee himself. Because Lee was hospitalized, his deposition was read to the jury and served as his testimony. Accordingly, the jury heard that Lee was driving about fifty miles per hour in the right travel lane of Route 50. He saw a vehicle in his left side mirror and thought "Buddy, you're getting too close. You're coming into my lane." Lee's next memory was of crashing through the brush on the right side of the highway. He did not remember striking the Ebb Tide truck, nor did he remember seeing the truck. When asked how his vehicle moved to the right shoulder, Lee stated that "I must have just turned the wheel to the right, slightly." When asked if he was guessing, Lee said "I don't remember turning the wheel, but I could have—but it could have been [a] reaction as I was looking, you know."

Appellants moved for "judgment on the issue of liability" at the close of Lee and Bay State's case, which the circuit court denied. The case was submitted to the jury, which found that Lee and Bay State were not negligent. Ayala and Santacruz timely appealed.

Additional facts will be discussed below.

## QUESTIONS PRESENTED

Appellants ask us to review five questions,[6] which we have consolidated:

---

6. Appellants seek review of the following:
 1. Appellants presented evidence demonstrating the collision was caused by Appellee's vehicle leaving the highway and striking Appellants' vehicle on the shoulder. Appellee presented no evidence as to the cause of the collision. Did the trial court commit error when it denied Appellants' Motions for Judgment as to Negligence?
 2. Appellant moved in limine to prohibit any reference to the immigration status of Appellants. The trial court denied this request thus allowing Appellee's counsel to transform the trial from a tort case to an immigration hearing. Did the trial court abuse its discretion in denying Appellants' motion in limine and permitting Appellee to inject racial bias and immigration matters into a tort trial?

I. Did the circuit court err when it denied appellants' motion for judgment?

II. Did the circuit court abuse its discretion when it denied appellants' motion *in limine* to exclude evidence of appellants' immigration status at trial?

III. Did the circuit court abuse its discretion when it permitted a de bene esse deposition of a witness who was legally issued the Social Security Number Ayala used?

IV. Did circuit court err when it refused to give appellants' requested jury instructions?

Because we conclude that the circuit court erred when it denied appellants' motion for judgment, we do not reach the third and fourth questions. We therefore reverse the denial of the motion for judgment and remand for trial on the issue of damages. Given that appellants' immigration status may again appear relevant at that stage, however, we also consider appellants' second question and address the propriety of evidence of immigration status.

## DISCUSSION

### I. Motion for Judgment

#### A. Background

Appellants argue that the facts of the accident "create a presumption of negligence" because Lee failed to maintain control of his vehicle. They assert that Lee violated two

---

3. The trial court allowed appellants to be questioned about employment verification forms and further allowed these forms to be admitted into evidence. Did the trial court abuse its discretion in this regard?

4. The jury instructions read by the trial court were improper. The trial court refused to give multiple jury instructions, improperly modified pattern jury instructions and interjected racial bias into jury instructions. Do these actions constitute prejudicial error?

5. The trial court permitted a de bene esse deposition in the middle of trial of a witness whose testimony was greatly prejudicial, whose testimony had no probative value and who had not been identified in pre-trial orders. Was this an abuse of discretion?

Maryland state laws when he crashed into the Ebb Tide vehicle: (1) Md.Code (1977, 2012 Repl.Vol.), Transportation Article ("Trans."), § 21–309(b), which states that a "vehicle shall be driven as nearly as practicable entirely within a single lane"; and (2) Trans. § 21–312(b), which states that a "person may not drive a vehicle from any controlled access highway except at the entrances and exits established by public authority." They contend that these violations are prima facie evidence of negligence. They therefore ask us to reverse the circuit court's denial of their motion for judgment. By contrast, appellees argue that Lee did not violate any state laws because restrictions on lane changes and access to and from a highway do not apply to travel to and from the shoulder of a highway. Appellees argue in the alternative that even if the laws apply, they create only an inference of negligence, not a presumption, making the court's denial of the motion for judgment and submission of the case to the jury appropriate.

## B. Standard of Review

■■■ An appellate court reviews *de novo* the denial of a motion for judgment in a civil case, applying the same standard as the circuit court. *See District of Columbia v. Singleton*, 425 Md. 398, 406, 41 A.3d 717 (2012). The evidence and reasonable inferences drawn therefrom are viewed in the light most favorable to the non-moving party. *Id.* at 407, 41 A.3d 717 (Citation omitted). If there was "any evidence, no matter how slight, that was legally sufficient to generate a jury question," the motion was properly denied. *Address v. Millstone*, 208 Md.App. 62, 80, 56 A.3d 323 (2012) (Quotation omitted). But, "where the evidence is not such as to generate a jury question, i.e., permits but one conclusion, the question is one of law and the motion must be granted." *Id.* (Quotation omitted); *see also Brown v. Bendix Radio Div. of Bendix Aviation Corp.*, 187 Md. 613, 619, 51 A.2d 292 (1947) ("[I]t is only where the minds of reasonable men cannot differ that the court is justified in deciding the question [of negligence] as a matter of law.").

## C. Negligence as a Matter of Law

 Finding negligence as a matter of law requires finding "in the evidence some prominent and decisive act, or failure to act, which permits of but one interpretation and in regard to which there is no room for reasonable minds to differ." *Weishaar v. Canestrale*, 241 Md. 676, 681, 217 A.2d 525 (1966); *see also Baltimore Transit Co. v. Prinz*, 215 Md. 398, 403, 137 A.2d 700 (1958) ("[N]egligence and reasonable care derive their significance from a factual background, in which there must be evidence of circumstances which support a legitimate inference that in the exercise of reasonable care injury could have been avoided."). Appellants bear the burden of proof of showing that Lee and Bay State were "guilty of negligence which directly contributed to the accident, since the happening of the accident does not of itself constitute negligence, and evidence of negligence does not give rise to liability unless the negligence was the cause of the injury." *Brehm v. Lorenz*, 206 Md. 500, 506, 112 A.2d 475 (1955). We believe that appellants have met their burden, as the evidence shows both that Lee was negligent as a matter of law in two significant ways and that his negligence was the cause of appellants' injuries. Lee was negligent as a matter of law because he (1) moved the Bay State truck from a travel lane to the shoulder when it was not safe to do so, and (2) failed to maintain a proper lookout.

### 1. Lane Changes

 Trans. § 21–309(b) states that a "vehicle shall be driven as nearly as practicable entirely within a single lane and may not be moved from that lane or moved from a shoulder or bikeway into a lane until the driver has determined that it is safe to do so." [7] Lee testified that he was

---

7. Lee argues that the definition of "roadway" expressly excludes the shoulder, meaning that § 21–309(b) does not apply to a vehicle's movement from a lane to the shoulder. We reject this argument because it leads to plainly absurd results. Lee's proffered interpretation would apply the statute to all lane changes *except* those involving a movement from a lane to the shoulder. We see no reason why drivers

driving in the right hand lane of Route 50. It was undisputed that the Ebb Tide truck was parked on the right shoulder of Route 50. Therefore, when Lee drove into the Ebb Tide truck, he "moved from" his lane into the shoulder. It was plainly not safe to do so, given that there was a vehicle in Lee's path and he crashed into it. Lee thus violated the statute, and, because the statutory violation was the proximate cause of the accident, he and his employer are liable for negligence.[8] *See Ford v. Bradford,* 213 Md. 534, 541, 132 A.2d 488 (1957) ("[T]he violation of a statutory regulation is evidence of negligence, and if such violation causes or contributes to the injuries complained of it constitutes negligence.").

## 2. Duty to Keep a Lookout

 Drivers of motor vehicles have a duty to both "observe carefully the road in front of them" and "be reasonably aware of what is occurring along the sides of a street or highway." *Morris v. Williams,* 258 Md. 625, 628, 267 A.2d 148 (1970). The duty to keep a lookout "follows the motorist wherever he directs his vehicle. The degree of vigilance necessary to constitute ordinary care varies with the circumstances, and certainly would be greater when one drives from pavement to shoulder." *Murphy v. Bd. of County Comm'rs,* 13 Md.App. 497, 510, 284 A.2d 261 (1971). Although the duty to keep a lookout is not specifically enumerated in any statute,[9] it is a clear common law duty that dates back to the early

---

should not be required to wait to move to the shoulder until "it is safe to do so," Trans. § 21–309(b); nor do we find any suggestion that the General Assembly intended to exclude this category of driver behavior from an otherwise generally applicable rule whose purpose is to regulate the safety of the highways by directing drivers to wait to change course until it is safe to do so.

**8.** Even without the statute, it would still be negligent for a driver to change lanes without first determining that it was safe to do so. *Wallace v. Fowler,* 183 Md. 97, 100, 36 A.2d 691 (1944) (discussing predecessor statute to Trans. § 21–309(b)).

**9.** However, several statutes imply a driver's duty to keep a lookout. For example, Trans. § 21–403 specifies when a driver is required to

twentieth-century rise in the popularity of automobiles. *See, e.g., Mahan v. State, to Use of Carr,* 172 Md. 373, 383, 191 A. 575 (1937) (a driver "has no right to assume that the road is clear, but that, under virtually all circumstances and at all times, he must be reasonably vigilant and must anticipate and expect the presence of others") (Quotation omitted); *Gittings v. Schenuit,* 122 Md. 282, 287, 90 A. 51 (1914) (stating that it was the defendant driver's "duty to keep a sharp lookout in the direction he was going").

The duty to keep a lookout is most frequently implicated in cases where a driver says that he looked and did not see anything, but then crashed into something anyway. For example, in *Dashiell v. Moore,* 177 Md. 657, 661, 11 A.2d 640 (1940), the defendant was changing the radio station while he was driving and struck a mule that was on the highway. He testified that he kept his eyes on the road while adjusting the radio and that he did not see the mule. *Id.* at 664, 11 A.2d 640. In affirming the judgment of negligence against the defendant, the Court of Appeals observed that "[i]t is settled law in this state that one will not be permitted to say that he looked and failed to see what he must have seen had he looked." *Id.* at 666, 11 A.2d 640. The Court explained further:

It is also a rational and a reasonable inference that had the defendant looked he could not have failed to see so large an object as a thirteen hundred pound mule which was there to be seen directly in front of his car and directly in front of his headlights at some distance before the collision. It was undoubtedly there, it was not invisible, and yet he said that

yield the right-of-way to an approaching vehicle, which necessarily requires looking for the approaching vehicle. Trans. § 21–603(a) prohibits a person from starting a "vehicle that is stopped, standing, or parked until the movement can be made with reasonable safety," which also implies that a driver must look to see what is around him and whether it is safe to proceed. Finally, Trans. § 21–604(b) prohibits a driver from moving a vehicle left or right on a roadway, turning, or "otherwise turn[ing] a vehicle from a direct course ... unless the movement can be made with reasonable safety," again implying a duty to look and see whether it is safe.

he never saw it at all before the collision, at the time of the collision or afterwards. It is not an unreasonable inference, therefore, that he could not have been looking ahead when he was adjusting the radio, or if he was, that his bent position prevented him from seeing the road directly in front of him. . . . The duty to look implies the duty to see what is in plain sight unless some reasonable explanation is shown. Where there is nothing to obstruct the vision of a driver, it is negligence not to see what is clearly visible.

*Id.* at 666–67, 11 A.2d 640 (Quotation omitted).[10] *See also Vizzini v. Dopkin*, 176 Md. 639, 643, 6 A.2d 637 (1939) ("The defendant said he was looking straight ahead and did not see the man pass in front of him, when it was obvious that he did pass in front of him. His failure to see the plaintiff does not relieve him of responsibility. The fact that there was rain, snow, or sleet, resulting in less visibility, is no excuse or reason for not seeing the plaintiff. When weather conditions or darkness are such as to interfere with or shade the view of the road, it only serves to increase the degree of care required of a driver."); *Baltimore Traction Co. v. Helms*, 84 Md. 515, 526, 36 A. 119 (1897) ("If a witness who can see testifies that he looked, and did not see an object which, if he had looked, he must have seen, such testimony is unworthy of consideration.").

■ Here, we do not even have testimony from Lee that he looked but did not see anything. He never said he looked ahead or to the right; his attention was focused to his left, where he thought he saw another vehicle "getting too close" to

---

**10.** *Dashiell* did not involve a motion for directed verdict, now known as a motion for judgment, and there is no indication that one was filed. However, it recognizes "settled law" on a duty to keep a lookout—one we believe that is not locked into only direct collisions in the "mule age," but extends to modern day crashes involving a stopped vehicle on a shoulder within the driver's lateral lookout. *See* Keith C. Miller, *Automobile Accident Law & Practice*, § 15.03[1] n. 9. Although the granting of a motion for judgment because the defendant was negligent as a matter of law will be a relatively rare occurrence, every decision establishing "settled law" in the area of automobile torts increases, not diminishes, the likelihood of the granting of such a motion.

his vehicle.[11] Yet the Ebb Tide truck was plainly visible on the shoulder ahead of him. Testimony showed that although it was raining on the day of the accident, there were no obstructions to vision along that portion of Route 50, nor was there any construction on that stretch of the roadway. In not seeing a truck that was clearly there, Lee failed to keep a proper lookout and was thus negligent because that failure resulted in the accident.

Lee would gain nothing by couching the events that led to the collision as an "unavoidable accident." In *Fry v. Carter*, 375 Md. 341, 825 A.2d 1042 (2003), the Court of Appeals concluded that an unavoidable accident is not a separate defense and that an instruction on unavoidable accident should no longer be given in negligence actions because it allows the jury "to speculate about last minute happenings." *Id.* at 356, 825 A.2d 1042. In so doing, the Court "recounted earlier cases discounting the notion that automobile accidents occur without negligence." *Id.* at 352, 825 A.2d 1042. And the Court found that there was ample evidence of negligence on the part of a tractor-trailer driver who struck and killed a traffic control manager standing in the gore off the road. *Id.* at 355, 825 A.2d 1042. Although the driver said he did not see the victim, blamed the accident on the State Highway Administration for narrowing the lanes, and argued that he could not have moved left to avoid the accident because of the presence of another vehicle, the Court rejected his contention that the accident was unavoidable and not negligent. *Id.* at 356, 825 A.2d 1042. The driver "could have slowed his speed further and continued to sound his horn," but did not. *Id.* at 355, 825 A.2d 1042. In this case, Lee did even less to prevent the collision.

We pause to address two other points Lee raises in arguing that he was not negligent as a matter of law. Lee characterizes the evidence as "merely establish[ing] that he was not speeding, was watching for vehicles around him, and reacted

---

11. The evidence was clear that this vehicle did not strike or damage Lee's truck.

to a motorist drifting into his lane of traffic." This view misstates the evidence before the trial court and the inferences that can logically be drawn from that evidence. First, the fact that Lee did not recall seeing the Ebb Tide truck demonstrates that he was not in fact watching for vehicles around him, despite his duty to keep a lookout. Second, Lee's own testimony established that his "reaction" to seeing a vehicle on his left was both unintentional and unexplained. In his deposition, Lee stated that he "must have just turned the wheel to the right, slightly," though he did not remember doing so. Whether or not Lee made the less negligent choice in the moment is irrelevant because he did not in fact make a choice at all: he saw a vehicle on his left but did not "remember turning the wheel" or crashing into the Ebb Tide truck on his right.[12]

To hold that this "I–didn't–see–it–and–I–don't–remember" defense without any real proof of justification is enough to force a negligence question to the jury would only encourage irresponsible behavior and foster bad tort law. We therefore vacate the jury verdict and reverse the denial of appellants' motion for judgment on the issue of liability.

## II. Immigration Status

### A. Background

Before the trial, appellants moved *in limine* to exclude evidence of their immigration status. They argued that their immigration status was irrelevant because "it neither serve[d] to bar [their] right to bring the actions nor as a defense for the Defendants' illegal and negligent actions but merely [was] an attempt to prejudice the jury against [them] for their statuses." In the alternative, appellants argued that their

---

12. If choice were an issue, Lee possibly could have slowed down or sounded his horn to avoid any encroachment from the left and certainly could have slowed down or braked before colliding with the parked vehicle that he struck with full force. *See Fry*, 375 Md. at 355, 825 A.2d 1042 (An accident is not unavoidable if the driver could have slowed down or sounded his horn).

immigration status should be excluded as prejudicial because the evidence "would poison the jury against [them] and prejudice the jury with information utterly irrelevant to the harms committed against [them] or the injuries they suffered." Appellants apparently filed this motion in response to correspondence they received from appellees' attorney, which indicated that appellees planned to a call a witness who would testify that Ayala's and Santacruz's Social Security Number cards and permanent resident cards were not legitimate. Not surprisingly, appellees opposed the motion *in limine*, arguing that evidence pertaining to immigration status was relevant because appellants were undocumented immigrants who were "prohibited by federal immigration law from earning *any* wages in the United States." They asserted that the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1324a, and *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002), suggested that appellants, because of their undocumented immigrant status, could not recover lost future earnings in the United States.

As discussed above, the circuit court ruled that immigration status was relevant and admissible evidence at a motions hearing prior to the trial. The court provided additional reasoning in a written opinion filed just prior to the August 2012 jury trial. It noted that appellants' immigration status was not relevant to the duty of care or the injuries alleged and that "[its] potential to unfairly prejudice [appellants] is [too] obvious to require elaboration." However, it emphasized that appellants' "claims for lost future wages and future medical expenses" put their immigration status at issue, because there were logical questions regarding how "a plaintiff's immigration status may create a greater likelihood that his earnings will not be earned in the U.S. labor market" and "as to the likelihood that a plaintiff's future care will not be provided in the expensive U.S. healthcare system."

### B. Standard of Review

An evidentiary ruling on a motion *in limine* "is left to the sound discretion of the trial judge and will only be

reversed upon a clear showing of abuse of discretion." *Malik v. State*, 152 Md.App. 305, 324, 831 A.2d 1101 (2003). The determination of relevancy and admission of evidence at trial is also reviewed for an abuse of discretion. *Martin v. State*, 364 Md. 692, 705, 775 A.2d 385 (2001).

## C. Federal Law

Because the federal government has the "preeminent role ... with respect to the regulation of aliens within our borders," *Toll v. Moreno*, 458 U.S. 1, 10, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982), questions about immigration status frequently start with an examination of federal law. With the IRCA, Congress declared that "it is unlawful for a person or other entity to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien ... with respect to such employment." 8 U.S.C. § 1324a(a)(1) (2013). However, the IRCA and its enforcement policies typically penalize employers rather than employees,[13] and no federal statute or Supreme Court case has directly addressed the question of whether undocumented immigrant plaintiffs are entitled to wage- and medical-based damages in personal injury cases. In *Hoffman*, the Supreme Court determined that federal immigration policy precluded the National Labor Relations Board from awarding an undocumented immigrant employee backpay because to do so "not only trivializes the immigration laws, it also condones and encourages future violations." 535 U.S. at 150, 122 S.Ct. 1275. However, because the Supreme Court's holding was limited to National Labor Relations Board matters, *id.* at 151, 122 S.Ct.

---

**13.** Enforcement against employers is also relatively low:

> In the ten-year period from 1992 to 2002, the number of investigations of employers of illegal aliens declined seventy percent, from 7053 to 2061, on-site job arrests of illegal aliens declined from 8027 to 451, and the fines imposed on employers declined from 1063 to thirteen—a staggering ninety-nine percent decrease.

Hugh Alexander Fuller, *Immigration, Compensation and Preemption: The Proper Measure of Lost Future Earning Capacity Damages after Hoffman Plastic Compounds, Inc. v. NLRB*, 58 Baylor L.Rev. 985, 1003 (2006).

1275[14] the Court's reasoning has not been expanded to preclude other wage-based damages, such as workers' compensation benefits or lost wages. *See generally* Wendy Andre, *Undocumented Immigrants and Their Personal Injury Actions: Keeping Immigration Policy Out of Lost Wage Awards and Enforcing the Compensatory and Deterrent Functions of Tort Law*, 13 Roger Williams U.L.Rev. 530, 550–54 (2008) (reviewing application of *Hoffman* in state courts).

In *Design Kitchen & Baths v. Lagos*, 388 Md. 718, 721, 882 A.2d 817 (2005), the Court of Appeals considered the effect of the IRCA and *Hoffman* on "the eligibility of an undocumented alien to receive workers' compensation." An employee injured his hand while operating a saw at his job and filed a claim for workers' compensation, which the Maryland Workers' Compensation Commission granted. *Id.* at 722, 882 A.2d 817. The employer appealed, arguing that the employee's "undocumented alien status" precluded him from receiving workers' compensation benefits. *Id.* at 723, 882 A.2d 817. In affirming the award, the Court of Appeals found that the purpose of the Maryland Workers' Compensation Act,[15] state public policy, and the lack of federal preemption all pointed in favor of awarding workers' compensation regardless of immigration status. *Id.* at 729–40, 882 A.2d 817. Although the Court did not expressly state that the IRCA did not preempt state law, it adopted the reasoning of other courts that concluded that the IRCA "itself gives no indication that Congress intended the act to preempt state laws whenever state laws operate to benefit undocumented aliens." *Id.* at 738, 882 A.2d 817 (quoting *Dowling v. Slotnik*, 244 Conn. 781, 712 A.2d 396, 404 (1998)).

---

**14.** *See also Avila–Blum v. Casa de Cambio Delgado, Inc.*, 236 F.R.D. 190, 192 (S.D.N.Y.2006) (finding that *Hoffman* is "limited to actions brought by the NLRB to enforce the National Labor Relations Act") (Citations omitted).

**15.** Then codified at Md.Code (1991, 1999 Repl.Vol.), Labor & Employment Article, Title 9.

■ We likewise conclude that neither the IRCA nor *Hoffman* mandates denying awards of lost wages or medical expenses to undocumented immigrant employees solely because of their immigration status. In reaching this conclusion, we are guided by the Court of Appeals' narrow view of the IRCA and *Hoffman* in *Design Kitchen & Baths*, 388 Md. at 735–40, 882 A.2d 817. We have also considered the decisions reached by courts in other states that have directly addressed the question and determined that neither the IRCA nor *Hoffman* prevents states from providing damages for lost wages and loss of earning capacity. *See, e.g., Continental PET Technologies, Inc. v. Palacias,* 269 Ga.App. 561, 604 S.E.2d 627, 631 (2004) (*Hoffman* "does not preempt Georgia law on the question of whether or not an illegal alien may receive workers' compensation benefits for employment"); *Balbuena v. IDR Realty LLC,* 6 N.Y.3d 338, 363, 812 N.Y.S.2d 416, 845 N.E.2d 1246 (N.Y.2006) (holding that the IRCA did "not bar maintenance of a claim for lost wages by an undocumented alien"); *Correa v. Waymouth Farms, Inc.,* 664 N.W.2d 324, 329 (Minn.2003) (concluding that *Hoffman* does not prevent award of state workers' compensation benefits); *Grocers Supply, Inc. v. Cabello,* 390 S.W.3d 707, 719 (Tex.App. 2012) ("We have found no evidence Congress intended IRCA to combat illegal immigration by encroaching into the States' authority to regulate health and safety matters[.]"); *Tyson Foods, Inc. v. Guzman,* 116 S.W.3d 233, 244 (Tex.App.2003) (holding that *Hoffman* did "not apply to common-law personal injury damages" and that "Texas law clearly allows for the recovery of damages for lost earning capacity, regardless of the claimant's citizenship or immigration status.").

## D. Evidence

Having determined that federal law does not preclude outright the award of lost wages or medical expenses in a personal injury action, for the guidance of the circuit court on remand we address whether evidence of appellants' immigration status would be relevant or prejudicial to the damages to which appellants may be entitled. Appellees argue that evi-

dence of immigration status is relevant to both appellants' claim of lost wages and their credibility.

### 1. Lost Wages

■■■■■■■ Immigration status is relevant to a claim for lost wages for the simple reason that the legal ability to work affects the likelihood of future earnings in the United States.[16] *See Rosa v. Partners in Progress, Inc.,* 152 N.H. 6, 868 A.2d 994, 1002 (2005); *Serrano v. Underground Utilities Corp.,* 407 N.J.Super. 253, 970 A.2d 1054, 1067 (Ct.App.Div.2009); *Salas v. Hi–Tech Erectors,* 168 Wash.2d 664, 230 P.3d 583, 586 (2010). Ayala and Santacruz sought lost earnings as part of their damages and thus established the basis for the relevance of their immigration status.

Yet relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Md. Rule 5–403. Immigration status is prejudicial in that it "introduces a factor into the case that might encourage the jury to dislike or disapprove of [a party] independent of the merits."[17] *United States v. Amaya–Manzanares,* 377 F.3d 39, 45 (1st Cir.2004). *See also United States v. Almeida–Perez,* 549 F.3d 1162, 1174 (8th Cir.2008) ("[T]he use of [immigration] evidence is fraught with the danger of prejudice to a defendant by introducing the possibility of invidious discrimination on the basis of alienage."); *Galaviz–Zamora v. Brady Farms, Inc.,* 230 F.R.D. 499, 502 (W.D.Mich.2005) ("[D]amage and prejudice which would result ... if discovery into ... immigration status is permitted *far* outweighs whatever minimal legitimate value such material

---

**16.** However, immigration status is irrelevant on the question of liability. *Hagl v. Jacob Stern & Sons, Inc.,* 396 F.Supp. 779, 784 (E.D.Pa.1975); *Melendres v. Soales,* 105 Mich.App. 73, 306 N.W.2d 399, 402 (1981).

**17.** Similarly, the Maryland Judicial Ethics Committee concluded that a judge may not ask a criminal defendant to divulge the defendant's immigration status at sentencing because of the risk of the "appearance of impropriety," in violation of the Canons of the Maryland Code of Judicial Conduct. Maryland Judicial Ethics Comm., Op. 2008–43 (2009).

holds for Defendants.") (emphasis in original); *Salas,* 230 P.3d at 586–87 (reviewing cases finding prejudicial effect of immigration status).

Accordingly, courts that have balanced the relevance and prejudice inquiries have frequently come down on the side of "prejudicial" because of the low probative value of evidence of immigration status. The risk of deportation of an undocumented immigrant is very small,[18] and the majority of courts that have considered the issue have held that the mere chance of deportation is not a sufficient basis for the introduction of immigration-related evidence. *See, e.g., Hernandez v. M/V Rajaan,* 848 F.2d 498, 500 (5th Cir.1988) (no error in excluding immigration evidence because there was "no proof that [the plaintiff] was about to be deported or would surely be deported"); *Hagl v. Jacob Stern & Sons, Inc.,* 396 F.Supp. 779, 785 (E.D.Pa.1975) ("[T]here was nothing which would have justified the jury's reducing damages because plaintiff is an alien who might conceivably face some unspecified immigration action at an unknown time."); *Clemente v. California,* 40 Cal.3d 202, 221, 219 Cal.Rptr. 445, 707 P.2d 818 (Cal.1985); *Klapa v. O & Y Liberty Plaza Co.,* 168 Misc.2d 911, 645 N.Y.S.2d 281, 282 (N.Y.Sup.Ct.1996) ("The fact that a plaintiff is deportable does not mean that deportation will actually occur. Further, whatever probative value illegal alien status may have is far outweighed by its prejudicial impact."); *Republic Waste Servs., Ltd. v. Martinez,* 335 S.W.3d 401, 409 (Tex.App.2011) ("Without a showing that a plaintiff will likely be deported in his working lifetime, the jury is invited to engage in conjecture and speculation regarding whether he will be deported, when he will be deported, and, if deported, whether he will return to the United States to work.").

If the court determines that evidence of a party's immigration status is not unfairly prejudicial, its relevance typically relates to whether a party is entitled to lost wages at

---

**18.** *See* n. 13, *supra.*

a United States pay rate or at the home country rate.[19] *See, e.g., Melendres v. Soales,* 105 Mich.App. 73, 306 N.W.2d 399, 402 (1981). The question of whether a party is entitled to United States earnings or home country earnings is a question of fact, because it necessarily depends on the jury determining the likelihood of whether or not the party will remain in the United States for the duration of the awarded compensation. *See Rodriguez v. Kline,* 186 Cal.App.3d 1145, 232 Cal.Rptr. 157, 158 (1986); *Melendres,* 306 N.W.2d at 402 (The jury has a "right to know of plaintiff's illegal status when calculating damages"). In other words, if it is unlikely that a plaintiff will be deported or if he shows a long history of working in the United States, a United States pay rate is more appropriate. If there is evidence that the plaintiff is likely to return to his home country, whether by choice or by deportation, a country of origin pay rate is more appropriate.

## 2. Credibility

Immigration status alone does not reflect upon an individual's character and is thus not admissible for impeachment purposes. *See Figeroa v. U.S. I.N.S.,* 886 F.2d 76, 79 (4th Cir.1989) ("An individual's status as an alien, legal or otherwise, however does not entitle the [government] to brand him a liar."); *Galaviz–Zamora,* 230 F.R.D. at 502 (finding no

---

**19.** Some courts have concluded that an undocumented immigrant may *only* recover lost wages at the home country rate. *See Wielgus v. Ryobi Technologies, Inc.,* 875 F.Supp.2d 854, 862 (N.D.Ill.2012) (predicting that Illinois law would preclude United States earnings but allow "the recovery of damages for lost future earnings or earning capacity based on what [a plaintiff] could legitimately earn in his country of lawful residence"); *Rosa,* 868 A.2d at 1000 (An illegal immigrant generally "may not recover lost United States earnings, because such earnings may be realized only if that illegal alien engages in unlawful employment"). At least one court has determined that undocumented immigrants are not entitled to any lost wages, regardless of the pay rate. *See Veliz v. Rental Service Corp. USA, Inc.,* 313 F.Supp.2d 1317, 1337 (M.D.Fla.2003) (applying Florida law and analogizing lost wages to backpay). We do not share these views because we believe that a blanket rule prohibiting United States earnings improperly ignores the reality of a plaintiff's living situation, regardless of his or her legal status.

connection between immigration status and witness credibility); *Mischalski v. Ford Motor Co.,* 935 F.Supp. 203, 207–08 (E.D.N.Y.1996) (no support for "the conclusion that the status of being an illegal alien impugns one's credibility"). Immigration violations that involve false statements, such as false employment papers, are more likely to be relevant, but are still subject to an intensive inquiry into the likelihood of prejudice, as discussed above. *See Serrano,* 970 A.2d at 1070 (observing that the likelihood of evidence of "employment-related false statements" leading to "other witnesses who could offer negative opinions or reputation testimony about plaintiffs' truthfulness" that would be admissible seems exceedingly low). Further, the relevance of an immigration-related false statement, standing on its own, is limited if the party against whom it is offered is not charged with an immigration-related crime. *See TXI Transp. Co. v. Hughes,* 306 S.W.3d 230, 241–42 (Tex.2010) (The collateral matter of defendant's immigration status was inadmissible impeachment evidence because it served only to "contradict [the defendant] on facts irrelevant to issues at trial").

However, we cannot ignore the fact that in this case, appellants clearly opened the door to questions about their immigration status when their answers to interrogatories differed substantively from documents they later submitted as evidence.[20] *See* Md. Rule 5–802.1(a) (The hearsay rule does not exclude cross-examination about statements that are inconsistent with declarant's testimony if the statement was "reduced to writing and was signed by the declarant"); Md. Rule 5–613 (examining a witness about a prior written statement). Specifically, Ayala and Santacruz indicated that they were legally permitted to work in the United States and provided copies of federal documents, such as their tax re-

---

**20.** Appellants may not have known that they could have objected to the interrogatories and not answered them. *See Galaviz–Zamora,* 230 F.R.D. at 503 (granting plaintiffs' motion for protective order, prohibiting disclosure of "[a]ny documents or information likely to lead to the discovery of Plaintiffs' immigration status," after defendants submitted interrogatories seeking information about immigration status).

turns, showing Social Security Numbers that were purportedly assigned to them. However, they later submitted copies of applications for asylum that stated that they were neither United States citizens nor legal residents. Thus, if on remand appellants choose to testify, their credibility may be challenged with questions asking them about these apparently inconsistent statements.

### 3. Considerations on Remand

In the event that questions are raised about appellants' immigration status at a future jury trial on damages, we summarize the limitations on such inquiries. The out-of-state case law suggests a multi-part inquiry into the circumstances of a party's immigration status. Facts for the jury to weigh include: whether there is an imminent risk of deportation; how long the party has been in the United States; his or her work history in the United States; whether he or she has a family in the United States; what the United States wage rate is; and what the comparable home country wage rate would be, among other considerations. *See* Part II.D.1, *supra.* There was some evidence of these questions before the circuit court. A future jury hearing the damages portion of the trial would benefit from a full exposition of these and other relevant facts, with the circuit judge serving as an alert monitor of any questioning or evidence that veers too far on the side of prejudice. For example, in our opinion the immigration-related questioning of certain witnesses, such as the medical experts and appellants' expert economist, went too far. While it would be proper to establish that the figures those witnesses relied on were based on United States dollars, any further attempt to elicit their opinion on costs outside of the country would be irrelevant. Appellees would benefit from securing their own expert witness who could testify about the likely costs in appellants' home country.

Further, it may be that appellants' applications for asylum have made some progress, which would be relevant to the question of whether they would leave the United States (assuming that if the applications were approved, appellants

would stay). Even if the applications have not been approved, the fact that they exist and that appellants are actively seeking asylum is certainly germane to the question of whether they plan to leave the United States in the future.

For all these reasons we reverse the judgment of the circuit court and remand for further proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. CASE REMANDED FOR DETERMINATION OF DAMAGES. COSTS TO BE PAID BY APPELLEES.**